UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                           No. 1:23-cr-40

          vs.                              Hon. Jane M. Beckering
                                            United States District Judge

RICK VERNON JOHNSON,

                Defendant.

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

Public service is a public trust, requiring officeholders to place their loyalty to the citizens they serve above private gain. That principle is particularly important if there is a lack of transparency into the work of public servants. Rick Johnson, while serving as Chair of the Michigan Medical Marijuana Licensing Board ("MMLB"), grossly violated that trust by soliciting and accepting bribes from lobbyists and companies that sought medical marijuana licenses.

Johnson demanded and received at least $110,200 in bribes while he was MMLB Chair, including cash payments, a $20,000 "loan" with no repayment terms or demand, flights on private aircraft, and thousands of dollars' worth of commercial sex with a woman in the adult entertainment industry. In return, Johnson provided an unfair advantage to bribe payers in the form of his favorable vote on license applications, his help and support throughout the licensing process, and confidential inside information pertaining to the Board's work and other applicants.

This bribery scheme resembled a well-orchestrated organized crime operation: Johnson used a second "burner phone" registered in the name of a limited liability company; bribe payers used an alias ("Batman") when referring to Johnson in messages; bribe payments were laundered through multiple limited liability companies controlled by Johnson to help conceal their purpose;

and Johnson and others devised false cover stories involving Johnson's wife should anyone discover and inquire about the payments.  Although ultimately laid bare, these machinations served to conceal Johnson's corruption long enough for the damage to be done, giving at least two companies a head start in Michigan's new and lucrative marijuana industry.

This Court should send a strong message to Johnson and others who might be tempted to follow in his footsteps.  He should be sentenced to at least 71 months in prison—at or above the high end of the sentencing guideline range—and pay a $110,200 fine for his illegal conduct.

## **BACKGROUND**

### A.  Summary of Facts

In May 2017, after a long career in politics, including five years in the Michigan House of Representatives and several years as its Speaker, Rick Johnson was appointed Chair of Michigan's MMLB.  In that role, Johnson wielded significant power and influence over Michigan's new medical marijuana licensing regime and owed Michigan residents a duty to act solely in their best interest.  But for several years, he did just the opposite:  He monetized his power and influence, demanded and accepted payments for help and action, and betrayed the people of Michigan.

The MMLB was a five-member board created by Michigan's 2016 Medical Marijuana Facilities Licensing Act, which allowed dispensaries and other businesses to operate legally for the first time in the State of Michigan.  *See* Mich. Comp. Laws § 333.27301 et seq.  Under the new law, prospective marijuana businesses had to be qualified by and receive a license from the MMLB, which at the time had both the responsibility for implementing the new law and the power to fully administer it.  *See* Mich. Comp. Laws § 333.27302.  Three votes were required to approve license applications. *Id.*

Given the potential profits from this new and lucrative industry – which in 2022 generated $2.3 billion in sales in Michigan – many prospective businesses viewed the marijuana licenses as a golden ticket to significant wealth, especially if they could be among the first to the market.  As Michigan's medical marijuana law and regulations were being developed, some businesses sought to limit the number of licenses to be issued by the state—to "keep the sandbox small," in their parlance, to attempt to increase their profits even further.  Some were willing to pay bribes to ensure their licenses were approved and that they could be among the first to the market.  Johnson solicited and accepted those bribes.

From 2005 until his appointment to the MMLB, Johnson worked as a lobbyist.  While in the private sector, and before the MMLB began operating, Johnson made it known to others that he was angling for an appointment to the Board.  Johnson and others used his past and current political connections as leverage to obtain nearly $2 million in payments for his lobbying services from individuals and entities related to the medical marijuana industry prior to his appointment to the MMLB.

Evidence obtained by the FBI demonstrated that co-defendants Brian Pierce ("Pierce") and Vince Brown ("Brown") also leveraged their relationship with Johnson to recruit and retain clients, generating substantial revenue for their lobbying businesses, Philip Alan Brown Consulting, LLC ("PABC") and Michigan Growers Consultants, LLC ("MGC").  Text messages in 2016, before Johnson's appointment, reflect that their clients were concerned because Johnson's appointment to the Board had not yet come to fruition, but Johnson was pressing them for an expected monthly payment that had not yet been made.  In one message about the power Johnson wielded over them, Brown stated:  "That's why happy batman is a great batman."  "Batman" was a code name for Johnson used by Pierce, Brown, their clients, and the commercial sex worker.  A representative of

Company C, one of Pierce and Brown's clients, verbally agreed to provide Johnson, Pierce, and Brown an equity stake in the company if it successfully obtained licenses to operate as one of the state's largest medical marijuana companies.   However, it does not appear that Company C delivered that equity stake as promised.

### 1.  Post-Appointment Payments from Pierce and Brown via PABC and MGC

After Johnson became a public official, Johnson wanted the easy money to continue. Johnson used his relationships, power, and influence to demand money from co-defendants Pierce and Brown.   Johnson solicited regular cash payments from Pierce and Brown using payment streams from medical marijuana clients.   The cover story for those payments was that Johnson's wife would do accounting work for PABC and MGC.   If anyone ever asked, they would say that Johnson's wife was their accountant—even though they used an outside accounting firm. Johnson had regular contact with Pierce and Brown while he was MMLB Chair, including at meetings with applicants who sought state licenses from the MMLB where Johnson was present.   He even shared office space with them.

Pierce and Brown are responsible for $42,000 in payments to, or for the benefit of, Johnson:

**Payments from PABC or MGC**

| Date | To | Amount |
|---|---|---|
| 6/8/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | Common Cents Harvest Farms | $2,000 |
| 9/11/2017 | JBJ Ranch, LLC | $2,000 |
| 10/5/2017 | JBJ Ranch, LLC | $2,000 |
| 12/6/2017 | Common Cents Harvest Farms | $3,000 |
| 12/20/2017 | JBJ Ranch, LLC | $4,000 |
| 2/15/2018 | JBJ Ranch, LLC | $2,000 |
| | Total | $19,000 |

**Payments From Flint River Flats, LLC**

| Date | To | Amount |
|------|----|--------| 
| 8/7/2018 | Common Cents Harvest Farms | $2,000 |
| 8/30/2018 | Common Cents Harvest Farms | $1,000 |
| 9/18/2018 | Common Cents Harvest Farms | $6,000 |
| 10/2/2018 | Common Cents Harvest Farms | $6,000 |
| 11/7/2018 | Common Cents Harvest Farms | $6,000 |
| | Total | $21,000 |

Additionally, at Johnson's request, Pierce paid a total of $2,000 to the woman who had commercial sex with Johnson.  Those amounts do not include other miscellaneous benefits provided to Johnson by Pierce and Brown, including tickets to sporting events.

As Johnson has admitted in his plea agreement, when he accepted the bribes, he understood that the payers were seeking information and assistance from him to help them successfully apply for state medical marijuana operating licenses and ultimately his support for their license applications when he voted on those applications.   Johnson provided valuable non-public information about the anticipated rules and operation of the MMLB and assistance with licensing application matters to representatives of Company A, Company B, Company C, Pierce, and Brown.  Brown and Pierce represented Company C.  After Johnson received the bribe payments, he voted in favor of approving the prequalification status of Company C and voted in favor of granting medical marijuana licenses to Company C.

### 2.  Post-Appointment Payments from Dalaly, Company A, and Company B

Oakland County businessman John Dalaly paid Johnson a total of $68,200 in bribes through Company A and Company B to influence and reward Johnson in connection with his official duties as chair of the MMLB.  These payments were a quid pro quo: the expectation was that, in return for the payments, Company A would get Johnson's vote for a license and Johnson would get the remaining MMLB members to support Company A's application.  To disguise the

source and nature of the bribes, Dalaly made the payments to three LLCs controlled by Johnson. Dalaly and Johnson also falsely claimed the payments were for "services" performed by Johnson's wife.  Specifically, Company A and Company B made the following payments to bank accounts maintained in the names of various companies Johnson controlled, namely JBJ Ranch, LLC; VM Enterprises, LLC; and Common Cents Harvest Farms, LLC:

### Payments to Johnson from "Company A"

| Date | To | Amount |
|---|---|---|
| 1/2/2018 | JBJ Ranch, LLC | $1,500 |
| 1/31/2018 | JBJ Ranch, LLC | $1,500 |
| 2/28/2018 | JBJ Ranch, LLC | $1,500 |
| 4/3/2018 | JBJ Ranch, LLC | $1,500 |
| 4/30/2018 | JBJ Ranch, LLC | $1,500 |
| 7/3/2018 | JBJ Ranch, LLC | $1,500 |
| 8/6/2018 | JBJ Ranch, LLC | $1,500 |
| 9/10/2018 | JBJ Ranch, LLC | $1,500 |
| 10/2/2018 | JBJ Ranch, LLC | $1,500 |
| 10/22/2018 | JBJ Ranch, LLC | $5,000 |
| 10/31/2018 | JBJ Ranch, LLC | $1,500 |
| 10/31/2018 | JBJ Ranch, LLC | $1,500 |
| 12/3/2018 | JBJ Ranch, LLC | $1,500 |
| 12/24/2018 | JBJ Ranch, LLC | $1,000 |
| 1/7/2019 | JBJ Ranch, LLC | $4,000 |
| 2/13/2019 | JBJ Ranch, LLC | $4,000 |
| | Total | $32,000 |

### Payments to Johnson from "Company B"

| Date | To | Amount |
|---|---|---|
| 4/28/2018 | VM Enterprises | $1,000 |
| 6/4/2018 | VM Enterprises | $1,000 |
| 7/6/2018 | VM Enterprises | $1,000 |
| 7/11/2018 | Common Cents Harvest Farms | $20,000 |
| 8/3/2018 | VM Enterprises | $1,000 |
| 9/11/2018 | VM Enterprises, LLC | $1,000 |
| 10/2/2018 | VM Enterprises, LLC | $1,000 |
| 10/29/2018 | VM Enterprises, LLC | $1,000 |
| 12/4/2018 | VM Enterprises, LLC | $1,000 |
| | Total | $28,000 |

Additionally, Johnson took two private flights (Learjet 35 and King Air 200 charters) from Michigan to Canada with Dalaly and others for "field trips" to meet with investors for Company A, who wined and dined with Johnson.  The total cost of the flights was $8,200.

In exchange for the bribes, Johnson took several official acts as MMLB chair that supported license applications submitted by Company A, including voting to approve Company A's prequalification status and application for licenses; providing Company A with advance information regarding MMLB rules and eligibility, and inside information on other applicants; and providing Company A with information on businesses whose license applications were going to be denied.

Johnson used his position and connections within the state's licensing agency to help Dalaly's companies.  Dalaly and Johnson met multiple times for lunch in the Lansing area.  During those lunches, they discussed the status of Company A's prequalification application and information about the State of Michigan's Department of Licensing and Regulatory Affairs ("LARA").  Johnson provided Dalaly with contact information for individuals at LARA and the status of other applicants.  One of Company A's business strategies was to pursue business opportunities with groups who were not going to get approved due to financial or other issues. Johnson provided Dalaly with copies of spreadsheets listing those companies and their contact information. The spreadsheets also included handwritten notations suggesting which companies were best, or should be a priority, for Company A to pursue.

Finally, to further conceal the bribes paid to Johnson, both Company A (represented by Dalaly) and Company C (represented by Pierce and Brown) falsely stated on their license applications that they had no financial relationship with Johnson. Johnson failed to disclose his

financial arrangements with Company A and Company C.  Both omissions also violated state law. *See* Mich. Comp. Laws § 333.27305.

### 3.  The Plea Agreement

On April 25, 2023, Johnson pled guilty pursuant to a plea agreement to a felony information charging him with one count of accepting a bribe in violation of 18 U.S.C. § 666(a)(1)(B).  On May 10, 2023, the Court accepted the guilty plea and adjudicated him guilty.

The parties stipulated in the plea agreement that Johnson accepted at least $110,200 in cash, gifts, and other things of value from several sources, including from representatives of companies seeking licensing approval from the MMLB and lobbyists who represented companies and individuals seeking approval, including Company A, Company C, Pierce, and Brown.  (R.2: Johnson Plea Agreement, PageID.15)  Johnson accepted those cash payments and benefits with the understanding that those cash payments and other benefits were offered and given to influence or reward him in connection with his official duties as a member and Chair of the MMLB.  (*Id.*, PageID.16)  Johnson arranged for those bribes to be paid to multiple LLCs over which he maintained control to help hide the cash payments.  Johnson also admitted that, while Chair of the MMLB and after he accepted those payments and benefits, he provided valuable non-public information about the anticipated rules and operation of the MMLB and assistance with license application matters to Company A and Company B.  (*Id.*, PageID.17)  Johnson further admitted that, from July 2018 through April 2019, he voted in favor of approving the prequalification status of Company A and Company C, and voted in favor of granting medical marijuana licenses to Company A and Company C.

### B.  The Presentence Investigation Report

The presentence report calculated Johnson's offense level as follows:

| | |
|---|---|
| Base Offense Level (public official accepting bribe): | 14 |
| Specific Offense Characteristic (payment of more than one bribe): | +2 |
| Specific Offense Characteristic ($110,200 in bribe payments): | +8 |
| Specific Offense Characteristic (bribes to a high-level decision maker) | +4 |
| Acceptance of Responsibility: | -3 |
| Total offense level: | 25 |

Johnson has no prior convictions, placing him in criminal history category I.  The advisory guidelines range before resolution of Johnson's legal objections is 57-71 months in prison and a fine of $20,000 to $200,000.

### ARGUMENT

### A.  Johnson was a Public Official in a High-Level Decision-Making or Sensitive Position

Johnson objects to the enhancement pursuant to USSG § 2C1.1(b)(3) for paying bribes to a public official in a high-level decision-making or sensitive position.  This Court has already overruled this objection at the sentencing of co-defendant John Dalaly.  For completeness of the record in this case, however, the government responds without relying on any evidence proffered by Johnson.

Section 2C1.1(b)(3) instructs the Court to increase the base offense level by four "if the offense involved an elected public official or any public official in a high-level decision-making or sensitive position."  The commentary defines a "high-level decision-making or sensitive position" as one "characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the

9

decision-making process." USSG § 2C1.1 cmt. n.4(A).  "Examples of a public official in a high-level decision-making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority."  *Id.*  Examples of a public official who holds a sensitive position include "a juror, a law enforcement officer, an election official, and any other similarly situated individual." *Id.  See, e.g.*, *United States v. Watkins*, 691 F.3d 841, 852-53 (6th Cir. 2012) (affirming application of enhancement where school district employee recommended particular bribe-paying vendor to his supervisor from list of bidders).

Johnson was appointed to the Board and as its Chair by then-Governor Rick Snyder pursuant to state law.  Mich. Comp. Laws § 333.27301(2). The MMLB was vested with the power and responsibility for implementing the new marijuana law and the power to fully administer it. Mich. Comp. Laws § 333.27302.  That included the power to grant or deny each application for a state operating license, investigate license applicants, investigate all individuals employed by marijuana facilities, enter, and inspect marijuana facilities without a warrant and without notice, investigate violations of the Act, conduct audits of marijuana facilities, and eject or exclude individuals from marijuana facilities.  *Id.*

Given these quasi-law enforcement powers and the fact that the MMLB was regulating an industry involving a controlled substance that, with very limited exceptions, previously had been illegal under Michigan law (and still is illegal under federal law), Johnson's role on the MMLB was similar to that of a police officer, one of the positions to which the Guidelines specifically say the enhancement should apply.

In *United States v. Hill*, 645 F.3d 900, 909 (7th Cir. 2011), the court found that a deputy liquor commissioner who had many of the same powers that Johnson had as chair of the MMLB occupied a high-level decision-making or sensitive position.  The deputy liquor commissioner had

the authority to accept and review applications for liquor licenses and to conduct background checks on applicants. *Id.* at 904. He also had the authority to conduct on-site inspections of businesses that held liquor licenses and issue citations for liquor code violations based upon his interpretation of the code. *Id.* Although the mayor had ultimate authority for the issuance and renewal of licenses, the deputy oversaw and had substantial influence over the process. *Id.*  These powers, which are almost identical to the ones wielded by Johnson and the MMLB, led the court in *Hill* to conclude that the deputy liquor commissioner occupied a sensitive position, meriting an enhancement under USSG § 2C1.1(b)(3).

Given the potential size of the marijuana industry, which is currently estimated at $2.3 billion, the value of the licenses approved by the MMLB was enormous.  Indeed, that was the very reason some applicants were willing to pay bribes to obtain a license.  The value of the licenses alone is a strong indication that Johnson was in a high-level or sensitive decision-making position. For example, in *United States v. Matzkin,* the court upheld the district court's finding that a United States Navy "supervisory engineer and branch head with responsibility for the technical aspects of major procurements" held a sensitive position because he "was involved in decision making on multi-million-dollar Navy contracts and had considerable discretion and influence in these matters." *Matzkin,* 14 F.3d 1014, 1016, 1021 (4th Cir. 1994).

As chair of the MMLB, Johnson had a similar level of authority as an agency administrator, one of the examples provided in the commentary, and exercised "a substantial influence over" its decision-making process.  Like the defendant in *Matzkin*, Johnson's position as chair of the MMLB gave him considerable discretion and influence over matters worth a tremendous amount of money.

11

Johnson objects that, as one member of a five-member board, Johnson did not have unilateral influence over the decision-making process on the MMLB. But that is not what is required. *See, e.g.*, *Hill*, 645 F.3d at 909 (affirming enhancement for defendant who did not hold supervisory position and whose actions were subject to appellate review). Johnson need only have a "substantial influence over the decision-making process," which as chair he undoubtedly had. Moreover, it only took three votes for the MMLB to approve a license.

In *Watkins* the Sixth Circuit held that the enhancement applied to a school district employee who supervised security, even though the employee did not directly award the security contracts. *Watkins,* 691 F.3d at 845-46, 852. In that case, the defendant was a technical supervisor who made security vendor recommendations to the school district Chief of Safety and Security, who was the individual ultimately responsible for awarding security contracts. Emphasizing that the enhancement applied to individuals who merely exercise "a substantial influence over the decision-making process," the court held that the enhancement was correctly applied because the defendant recommended certain security vendors and the Chief of Safety and Security relied on those recommendations when awarding contracts. *Id.* at 852. As Chair of the MMLB, Johnson clearly had a "substantial influence" over its decision-making process.

**B.  The Bribe Payments to Johnson Should Include the $20,000 "Loan"**

At the presentence investigation objection meeting, counsel for Johnson argued that the $20,000 payment from Company B to Common Cents Harvest Farms, LLC on July 11, 2018, should not be counted as a bribe because it actually was a loan. He contends that because he initially described that payment as a loan that he intended to repay, it should not be counted as a bribe payment. This Court has already overruled this objection at the sentencing of co-defendant John Dalaly. For completeness of the record in this case, however, the government responds

12

without relying on any evidence proffered by Johnson.

The objection should be denied. The $20,000 payment does not bear any of the hallmarks of a true loan. There was no promissory note, no written loan agreement, no maturity date, no repayment schedule, and no interest rate. Company B's bookkeeper did not consider the payment to be a real loan. (R.66: Dalaly PSR, ¶ 21, n.1) Johnson never repaid any of the money and neither Company B nor Dalaly sought repayment from Johnson. Moreover, Johnson admitted in his plea agreement that he accepted a total of $110,200 in bribes—a figure that contains the $20,000 payment from Company B. (R.2: Johnson Plea Agreement, PageID.15)

There is only one logical reason why Johnson would solicit, and Dalaly would provide, a $20,000 with no repayment terms: Johnson was the MMLB Chair and Dalaly desired his continued support and assistance with launching his businesses. There was no preexisting relationship or friendship between Dalaly and Johnson. All of this demonstrates that the $20,000 payment was not a true loan, regardless of how the bribe payer and recipient once characterized the transaction.

### C. This Court Should Not Depart or Vary Downward to Account for a Possible Guideline Amendment

The PSR identified Sentencing Guideline Amendment 821 relating to criminal history as a factor that may warrant a sentence outside the advisory guidelines. (R.83: PSR ¶ 211, PageID.800) The government objects to a departure or variance on that basis as premature.

Pursuant to 28 U.S.C. § 994(p), the United States Sentencing Commission submitted to Congress a proposed new guideline, USSG § 4C1.1 (Adjustment for Certain Zero-Point Offenders). That guideline would provide a decrease of two offense levels for defendants with no criminal history points whose offense did not involve specific aggravating factors. If Congress

13

does not act to disapprove the amendment, it will take effect on November 1, 2023.[1]  On August 24, 2023, the Sentencing Commission voted for delayed retroactive application of Amendment 821, effective February 1, 2024.[2]

This Court should not depart or vary downward under Section 3553(a) based on proposed Part B of Amendment 821.  Although this Court may consider pending guideline amendments at the time of sentencing, there is no obligation to prematurely award Johnson a departure or variance based on a proposed guideline amendment.  *See United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017) (citing *United States v. Jimenez*, 517 F. App'x 398, 400 (6th Cir. 2013)).

The pending Guideline amendment has not yet taken effect and, if Congress disapproves of it before November 1, 2023, it will not take effect.  Moreover, in this case, there is no apparent prejudice to Johnson by waiting until Amendment 821 becomes effective.  Assuming Johnson qualifies for a retroactive sentence reduction as approved by the Commission, he can move this Court for relief if both the substantive and retroactivity amendments become effective.

### D.  The Court Should Not Depart Downward Pursuant to USSG § 2B1.1

Johnson believes there are factors that warrant a departure from the applicable guideline range pursuant to commentary in USSG § 2B1.1.  Specifically, he asserts that the offense level overstates the seriousness of the offense.  (R.83: Johnson PSR, PageID.800)  The government disagrees.

The commentary cited by Johnson provides:  "There may be cases in which the offense

---

[1] *See* United States Sentencing Commission, *Official Text of Amendments to the Sentencing Guidelines*, Part B, Subpart 1, at 45, 52 (April 27, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf.

[2] *See* United States Sentencing Commission, *Amendment to Policy Statement at USSG § 1B1.10* (Aug. 31, 2023), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." USSG 2B1.1, comment. (n.21(C)). The commentary provides one example: a securities fraud involving a fraudulent statement made publicly to the entire market that produces an aggregate loss "that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims." In such a case, both the loss amount and number of victims "may combine to produce an offense level that substantially overstates the seriousness of the offense." *Id.*

This case presents an entirely different scenario than what is contemplated by that guideline commentary. First, the applicable guideline scoring provision is USSG § 2C1.1, not § 2B1.1. Section 2C1.1 does not contain a downward departure provision, nor does it cross reference Application Note 21(C) of § 2B1.1. Rather, it contains only an upward departure provision. *See* USSG § 2C1.1, comment. (n.7).

Second, application of the pertinent guideline, § 2C1.1, provides 20 of the 28 levels comprising the adjusted offense level. The loss table at § 2B1.1 is cross-referenced only for an additional 8 levels based on the total amount of bribe payments Johnson is being held accountable for in this case. Additionally, a victim adjustment is not applicable in this case. Therefore, the guideline scoring in this case is not akin to a case involving thousands or tens of thousands of investors as the result of a public announcement, or anything similar.

Johnson's argument also conflicts with the history of § 2C1.1, which was amended in 2004 to "reflect[] the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses."[3] To achieve its goal

---

[3] *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines* (May 10, 2004) at 70, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20040430_RF_Amendments_0.pdf.

of more severe punishment for public corruption offenses, the Commission increased the base offense level from 10 to 14 if the defendant was a public official, noting that "[t]he higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes." *Id.*

Additionally, the Commission retained the cross-reference to the loss table in USSG § 2B1.1, reflecting a deliberate decision to continue to increase punishment for higher bribe amounts. The Commission noted its intent to "ensure[] that the offense level will always rise commensurate with the financial magnitude of the offense . . . ." *Id.*

Johnson's argument that the loss table in § 2B1.1 results in a total offense level that substantially overstates the seriousness of the offense is contrary to the stated views of the Sentencing Commission and without merit. Accordingly, this Court should not depart downward from the advisory Guideline range.

### E. Johnson Should Serve at Least a 71-month Prison Sentence

As this Court knows, the statutory maximum prison sentence in this case is 10 years, but the sentence ultimately imposed must comply with the pertinent statutory sentencing factors established by Congress and codified at 18 U.S.C. § 3553(a), including:

### 1. The Need for the Sentence to Reflect the Seriousness of the Offense, and to Provide Just Punishment

Section 3553(a) directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment. These factors are among the most important factors a court considers in a public corruption case and they counsel in favor of a

16

significant prison sentence.  Bribery of public officials is a very serious offense because that
conduct severely damages the public trust in our government institutions:

> Government corruption breeds cynicism and mistrust of elected officials. It causes
> the public to disengage from the democratic process because . . . the public begins
> to think of politics as 'only for the insiders.' Thus corruption has the potential to
> shred the delicate fabricate of democracy by making the average citizen lose respect
> and trust in elected officials and give up any hope of participating in government
> through legitimate channels.

*United States v. Ganim*, No. 3:01CR263, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order
denying resentencing of former mayor of Bridgeport).

More pointedly, the 26th President of the United States, Theodore Roosevelt, explained to
Congress in 1903 that bribery is a threat to the existence of democracy itself:

> There can be no crime more serious than bribery. Other offenses violate one law
> while *corruption strikes at the foundation of all law*. Under our form of
> Government all authority is vested in the people and by them delegated to those
> who represent them in official capacity. *There can be no offense heavier than that
> of him in whom such a sacred trust has been reposed, who sells it for his own gain
> and enrichment*; and no less heavy is the offense of the bribe giver. He is worse
> than the thief, for the thief robs the individual, while the corrupt official plunders
> an entire city or State.... Government of the people, by the people, for the people
> will perish from the face of the earth if bribery is tolerated.

Theodore Roosevelt, Third Annual Message to the Senate and House of Representatives (Dec. 7,
1903) (emphasis added) *available at* The American Presidency Project of UC Santa Barbara,
https://www.presidency.ucsb.edu/documents/third-annual-message-16.

In this case, Johnson demanded and received more than $100,000 in bribes, which
corrupted the process for the state's issuance of licenses for businesses to operate in a new and
lucrative industry.  Johnson worked not in the best interests of the citizens of Michigan, but for his
own personal interests and for the individuals and companies who paid him bribes.  In taking those
bribes, Johnson not only violated federal law prohibiting the solicitation and acceptance of bribes,

he also violated the state's medical marijuana law by failing to disclose his financial interest with those applicants.

Those who were denied a license by the MMLB now may wonder whether they had a fair and equal opportunity to compete in the industry.  Law-abiding qualified applicants who did not have the ultimate insider "on the take" may have struggled with understanding and navigating what became a tedious and lengthy application and approval process.  At the very least, although the government has no evidence that Johnson's receipt of bribe payments prevented other qualified applicants from ultimately obtain licenses, Johnson's crime has significantly damaged the trust that law-abiding citizens placed in his work as MMLB Chair and in state government.

Moreover, this was not a brief or isolated error in judgment.  Johnson repeatedly accepted no fewer than 38 cash bribe payments over a period of 21 months between June 2017 and February 2019—not including the other "in kind" payments and benefits he received while Chair, including meals and flights on private airplanes on "field trips" to Canada to meet with Company A's investors.  He used two different cell phones to communicate, making it harder for law enforcement to investigate his conduct.  Some of his bribe payers were careful to refer to him as "Batman," a Bat emoji, or "our friend" when referring to him.  The manner in which the payments were moved through LLCs and disguised demonstrate that everyone, including Johnson, knew that what they were doing was unlawful.  Finally, Johnson's repeated use of a prostitute who was paid to have sex with him on multiple occasions by businessmen seeking his help and licenses from the state is abhorrent behavior.  In their totality, Johnson's criminal acts and his attempt to evade law enforcement are utterly disgraceful and worthy of punishment well above the low-end of the advisory guideline range for a bribery offense.

A custodial sentence below the advisory guidelines range would fail to account for the harm Johnson and his bribe payers have inflicted by furthering public cynicism and distrust of elected officials and government processes.

### 2. The Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public

The need to deter others from paying and receiving bribes may be the most important sentencing factor in this case. Corruption crimes threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("[O]ne of the primary objectives' of sentencing elected officials convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Id.* at 450–51 (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013)); *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

In this case, both a corrupt public official and some of the business interests who chose to influence him to secure licenses to operate in the medical marijuana industry have been brought to justice. A 71-month prison sentence would send a much-needed deterrent message to those who currently are in a position of public trust and to those who someday will be entrusted with working on behalf of and for the people—not only in the state of Michigan but across the nation.

**3.   The Sentence Should Include a Substantial Monetary Fine**

In addition to a lengthy prison sentence, this Court should impose a monetary fine of at least $110,200, which is the total amount of the bribes Johnson obtained from Company A, Company B, and Company C.  In determining the imposition of a fine, the Court should consider the same § 3553(a) factors it considered in fashioning a prison sentence, along with Johnson's ability to pay a fine, the expected costs to the government of any prison term and term of supervised release, and other pertinent considerations.  *See* USSG § 5E1.2(c)(3).  Johnson can pay a fine within the advisory Guideline range of $20,000 to $200,000.  Moreover, a fine would further deter him and others from criminal conduct, and it would cover some of the costs to the government for his anticipated imprisonment and supervised release.

<div style="margin-left: 50%;">

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

</div>

Dated:  September 14, 2023

<div style="margin-left: 50%;">

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
Assistant United States Attorney

/s/ *Clay Stiffler*
CLAY STIFFLER
Assistant United States Attorney

United States Attorney's Office
P.O. Box 208
Grand Rapids MI 49501
(616) 456-2404
christopher.oconnor@usdoj.gov
clay.stiffler@usdoj.gov

</div>