UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:23-cr-40 |
| Plaintiff, | |
| v. | HON. JANE M. BECKERING |
| RICK JOHNSON, | United States District Judge |
| Defendant. | |

**DEFENDANT RICK JOHNSON'S SENTENCING MEMORANDUM**

Rick Johnson pled guilty to accepting bribes. He betrayed the trust invested in him by the State of Michigan, his community, and his family by accepting the bribes. He pled guilty and accepted full responsibility for his actions. This was the first step toward regaining trust.

The conduct that brings Rick Johnson before the Court far from defines him. He is a decorated public servant, a successful politician, a devoted family man, and a community-oriented person. His personal and professional record were impressive and untarnished for 70 years. Unfortunately, that streak has now come to an end. However, the bad decisions leading to his conviction should not moot the many years of countless good deeds performed by Mr. Johnson.

I.  LEGAL STANARDARD.

Under *United States v. Booker*, 543 U.S. 220 (2005), this Court shall consider several factors in determining a defendant's sentence. After scoring the guideline

range, and "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2008). As explained in *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), 18 U.S.C. § 3553(a) contains an overarching instruction to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing goals set forth in § 3553(a)(2).

1. ***Nature and circumstances of the offense and the history and characteristics of the defendant.***

    a. ***Nature and circumstances of the offense.***

There is no denying that the nature and circumstances of the offense are deeply regrettable. Mr. Johnson was appointed to the Michigan Medical Marijuana Licensing Board ("MMLB"). This was a five-member board, with no one member, despite Mr. Johnson's appointment as chairman, holding any more power over the other board members.

However, Mr. Johnson fell short of the expectations bestowed upon him. He leveraged his position on the MMLB to accept benefits from applicants seeking a license. Essentially, the applicants attempted to purchase Mr. Johnson's vote, or the perception of his ability to assist with their application. In exchange for benefits, Mr. Johnson would vote favorably for the applicant. Mr. Johnson pled guilty to accept responsibility for his actions. Mr. Johnson cooperated with the government to come clean and help restore faith and trust in public services, and hopefully, rebuilt trust with others.

### b. *History and Characteristics of Rick Johnson.*

Mr. Johnson lives in the very same community in which he was born – Leroy, MI. He has spent all 70 years of his life, with exception to his service in the military and time in Lansing, in the same town and on the same dairy farm. Mr. Johnson continues to tend to his family farm which was previously farmed by his father. In fact, Mr. Johnson resides in the same house he was raised. His humble roots instilled values such as a strong work ethic, decency toward others, a charitable mindset, and above all, a deep commitment to family.

Mr. Johnson learned these values working long hours on the family farm as a child. He put them into practice as an adult. In 1971, Mr. Johnson was elected the Rose Lake Township Treasurer. In 1972, Mr. Johnson was drafted into the United States Army. He served 4 months in active duty and 6 years in the Army Reserves. He received an honorable discharge. *Exhibit A*.

From 1980 – 1986, Mr. Johnson served on the Pine River Area School Board of Education. Beginning in 1986, and through 1994, Mr. Johnson served on the Osceola Board of Commission. After almost 10 years on the Osceola Board of Commission, Mr. Johnson served on the Michigan Farm Bureau Board of Directors for four years.

Finally, in 1998, Mr. Johnson was elected to the Michigan House of Representatives for the 102nd District. He served as Speaker of the House from 2001 – 2004. In 2004, Mr. Johnson organized and hosted National Speakers Conference on Mackinac Island, an event for past and current House Speakers from throughout the country to collaborate on and promote public service initiatives.

Apart from decades of public service, Mr. Johnson has served on numerous boards for charitable organizations. These include Michigan Promise, Achieve 121, Friends of Ferris, Michigan 4H, and others. Mr. Johnson received various forms of recognition for his efforts in the community, including an honorary degree of Doctor of Public Service from Ferris State University. Additionally, a scholarship in Rick Johnson's name is issued to children to pursue higher education. *Exhibit B.*

Mr. Johnson has been married to his wife Janice Johnson for the past 14 years. He is a father of two adult children and enjoys a close relationship to his wife's children. Mr. Johnson has six grandchildren. They are very important to him. He regularly drops them off at school and attends their sporting events. Mr. Johnson also helps care for his disabled brother who lives nearby.

It is not hard to see that Mr. Johnson has spent a lifetime building up his community, his family, and many people around him – including disadvantaged children. The Court should give strong consideration to Mr. Johnson's many roles in state and local government and community involvement.

### 2. *The need for the sentence imposed.*

Under this section, the Court should take into account: (1) the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

Mr. Johnson committed a serious violation of federal law. This crime also undermines trust in state-government. Mr. Johnson pled guilty because he knew he was in the wrong and wanted to accept responsibility.

This conviction represents Mr. Johnson's first encounter with the criminal justice system. Zero criminal history category points are scored. Aside from the matter before the Court, Mr. Johnson has led an exemplary life. His efforts to enhance education and benefits for children through the State of Michigan help illustrate Mr. Johnson's character. Defendants like Mr. Johnson who have no criminal history, have many redeeming qualities, possess an admirable work history, and who do not demonstrate a risk to society are commonly afforded leniency from the Court. Mr. Johnson should be no different.

Mr. Johnson is 70 years old. His health is not great because of high blood pressure, high cholesterol, and sleep apnea. Needless to say, this matter has taken an even greater toll on his wellbeing. Any sentence imposed should take Mr. Johnson's physical health into consideration. The Court can be sure that this is Mr. Johnson's only, and last, dalliance with the criminal justice system.

3. ***The kinds of sentences available.***

The maximum sentence for Count 1 is not more than 10 years in prison and/or up to a $250,000 fine. (ECF No. 6). The Court may impose a term of supervised release of not more than three years. *Id*.

### *4. The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.*

The parties agree that the base offense level is 14, that a 2-level enhancement is proper under U.S.S.G. §2C1.1(b)(1), and that an 8-level enhancement is proper under U.S.S.G. §2B1.1(b)(1)(E), subject to a potential reduction based on the alleged $20,000 transaction between John Dalaly and Mr. Johnson. With a Criminal History Category of I and an Offense Level of 24, Mr. Johnson's guidelines are 51 – 63 months. The guidelines are 37 – 46 months with the 3-level reduction for acceptance of responsibility.

Mr. Johnson was not in a high-level decision-making or sensitive position. The objection pursuant to U.S.S.G. §2C1.1(b)(3) is addressed in more detail below. In simple terms, the 4-level objection should not be scored against Mr. Johnson because he was only one of five members of the MMLB, with no one member holding any more authority than another. The "chair" designation is a red herring. It was a title with no consequence. Accordingly, Mr. Johnson's guideline range of 37 – 46 months should be unaffected by the proposed enhancement because it does not apply.

The guideline range should further be reduced because of Mr. Johnson's cooperation. Mr. Johnson met with the United States Attorney's Office several times to discuss his involvement, and that of others associated with the situation. This included information on individuals that have not been charged, but were undeniably and deeply involved in the overall situation. Mr. Johnson's cooperation also served as corroboration to statements from other Defendants. Regardless of whether the

government files a §5k motion, the Court should take Mr. Johnson's substantial and material assistance into account and reduce his sentencing guidelines.

An additional issue is whether the $20,000 payment from John Dalaly to Mr. Johnson was a loan. Counsel for John Dalaly objected to the characterization of this transaction as a bribe. The Court determined the payment was a bribe. Had the Court concluded it was a loan, Mr. Johnson's loss calculation under §2B1.1 would be a 6-level increase, rather than an 8-level increase, because his loss would be below $95,000. Mr. Johnson takes no position in conflict with his plea agreement.

5. ***Pertinent policy statements issued by the Sentencing Commission.***

Mr. Johnson is not aware of any policy statements applicable to his guidelines, other than the need for a sentence consistent with the factors set forth in 18 U.S.C. § 3553(a).

6. ***The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.***

Generally, Defendant is not aware of any disparities.

7. ***The need to provide restitution to any victims of the offense.***

Mr. Johnson requests that the Court impose restitution consistent with the terms of the plea agreement.

II. **ADDITIONAL INFORMATION IN SUPPORT OF A SENTENCE CONSISTENT WITH THE FACTS OF THE CASE AND APPLICABLE GUIDELINES.**

The sentencing factors of 18 U.S.C. § 3553(a) require a sentence that is sufficient but not greater than necessary. This includes considering the totality of

circumstances related to an individual defendant. Here, the Court should consider factors such as the support behind Mr. Johnson.

Mr. Johnson's commitment to the State of Michigan, his community, and family is well-documented. Now, so is his recent shortcoming. Notwithstanding the pending case, many people from the community have come forward to express their support for Rick Johnson. *Exhibit C*. These include friends, former colleagues, attorneys, and even political rivals. Below are excerpts from some of these letters which comment on Mr. Johnson's character and capabilities.

- Richard Whitmer – "I have known Rick for a long time and have dealt with him on a number of issues, from legislative matters to serving on a small advocacy group he chaired supporting stem cell research. In each of these interactions I have never known him to be involved in anything that failed to measure up to the highest standards."

- James C. Howell, Esq. – "Although I find this confusing as far as the Rick Johnson that I have known for the past 25 years, I believe that his life up to the point of the commission of the crime that he has plead [sic] to is a total contradiction to the life that he lead previously."

- Larry Julian (former Speaker Pro Tem under Mr. Johnson) – "I have known Rick Johnson since 1999 since my first year in office and serving with him. I consider him a true leader and an example to me in my leadership position."

- Gregory Andrews (former Director – Governor Snyder's Northern Office) – "Public service can be a thankless job; Rick served the people of Michigan with unwavering passion."

- Sheri Osborn (long-time friend from Leroy, MI) – "Rick is a very loving husband, father, grandfather, and friend.  His family evolves [sic] around his family and friends.  Please consider this letter on behalf of Rick Johnson for he is a wonderful man with a huge heart."

- John B. Harwood (former Rhode Island Speaker of the House) – "I believe Rick's conduct in the instant matter was an aberration.  I base my opinion on the twenty-year relationship I've had with Rick and honestly believe he is a good person, with his heart in the right place."

- Theresa Davenport (daughter of Rick Johnson) – "My father, Rick Johnson always has been and always will be the person I looked up to as a child and wanted to become as an adult.  Working hard to earn everything I have attained, accepting accomplishments and learning from errors, I am proud of the person who taught me to be humble.  Something I strive to teach my children every day."

The Court should take this outpouring of support into consideration, along with Mr. Johnson's age and health.  An extended period of custody is likely to worsen Mr. Johnson's health complications, making a prison sentence significantly more difficult.  Additionally, the Court has many options at its disposal when imposing a

sentence. Given Mr. Johnson's experience, skills, support, and connections, part of his penance to society could be through community service.

### III. OBJECTIONS.

There are several objections to the Presentence Investigation Report. These are addressed below.

1. **Paragraph 137 – U.S.S.G. §2C1.1(b)(3).**

U.S.S.G. § 2C1.1(b)(3) provides for a four-level enhancement if "the offense involved an elected public official or any public official in a high-level decision-making or sensitive position[.]" "'High-level decision-making or sensitive position' means a position characterized by a **direct authority to make decisions for, or on behalf of**, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." *Id.*, application note 4. (Emphasis Added).

In some instances, courts in the Sixth Circuit have focused on whether the defendant was an elected official in applying the enhancement under U.S.S.G. § 2C1.1(b)(3). "That base offense level is increased four levels because Conley was an *elected* public official. *See* U.S.S.G. § 2C1.1(b)(3). The enhancement captures the violation of the public trust by an *elected* public official that is not accounted for in the base offense level." *United States v. Conley*, 2018 U.S. Dist. LEXIS 83281, *6-7, 2018 WL 2275231. (Emphasis in original). This analysis cannot be applied to Mr. Johnson because he was not an elected official of the MMLB.

Even where an individual is appointed to a position, rather than elected, the Sixth Circuit has held the enhancement does not apply. See, *United States v. McIntosh*, 1992 U.S. App. LEXIS 34839, \*23 (December 29, 2012) (An appointed mayor who held all decision-making authority was not a "high-level decision maker").

Courts also look to the defendant's decision-making authority. Specifically, the 4-level enhancement requires "substantial influence over the decision-making process." U.S.S.G. § 2C1.1(b)(3), application note 4. For example, in *United States v. Watkins*, 691 F.3d 841 (6th Cir. 2012), the defendant worked as the Technical Supervisor for Safety and Security for the Cleveland Metropolitan School District. He was convicted, among other things, of one count of bribery in a federally funded program in violation of 18 U.S.C. § 666(a)(1)(B). His sentence was enhanced 4-levels pursuant to U.S.S.G. § 2C1.1(b)(3). On appeal, the Sixth Circuit emphasized the defendant's unilateral ability to influence government workings:

> Based upon the totality of the evidence before the Court, it is clear that Watkins had "substantial influence" over the selection process. When bids came in, Watkins would take the 10 to 15 vendors and narrow them down to a much smaller group before presenting them to Fultz. After narrowing the vendors down, Watkins would then recommend a particular vendor. Those facts alone demonstrate a substantial influence on the decision-making process. In addition to those facts, Fultz testified that Watkins had the ability to single-handedly stop payment on invoices. If Watkins expressed that a repair had not been substantially completed, Fultz would not pay the invoice. Furthermore, Fultz testified that he was not an expert with respect to security cameras and therefore relied on Watkins because of his expertise. Finally, Fultz explained that he relied on Watkins['s] input because Watkins had been with the [S]chool [D]istrict for a longer period of time. All of those facts taken together demonstrate that Watkins had substantial influence over the decision-making process. *United States v. Watkins*, 691 F.3d 841, 852 (6th Cir. 2012).

11

In other pleadings, the government relied on the Seventh Circuit case *United States v. Hill*, 645 F.3d 900 (7th Cir. 2011). In *Hill*, the defendant pled guilty to attempting to commit extortion under color of official right in violation of 18 U.S.C. § 1951 and making false statements to the FBI and IRS in violation of 18 U.S.C. § 1001(a)(2). The defendant's sentence was enhanced under U.S.S.G. § 2C1.1(b)(3).

The defendant was appointed by the mayor to a new position of deputy liquor commissioner. The defendant also served as the mayor's assistant, sometimes requiring him to appear on behalf of the mayor and conduct fundraising events. *Hill*, 645 F.3d at 904. In addition, under Illinois law, the liquor commissioner had the following authority: "The commissioner has the power to grant, suspend, or revoke licenses, enter or authorize any law enforcement officer to enter a licensed premises to determine whether the provisions of the Act have been violated, receive local license fees, and levy fines. He may also examine a license applicant under oath, examine the applicant's books and records, and issue subpoenas." *Id*., quoting 235 Ill. Comp. Stat. 5/4-2.

Even further, "[t]he mayor granted Hill, as deputy liquor commissioner, the authority to accept and review applications for liquor licenses and to conduct background checks on applicants. Hill also had the authority to conduct on-site inspections of businesses that held liquor licenses and issue citations for liquor code violations based upon his interpretation of the code." *Id*. at 904.

On appeal to the Seventh Circuit, the defendant argued that he did not have actual authority over the granting or renewal of licenses and that he was not a high-

level decision-maker or occupant of a sensitive position. The Seventh Circuit rejected both arguments. As for the first argument, the Court identified that the defendant had de facto power to deny renewal licenses, inspect business records, and issue citations for liquor code violations. *Id*. at 907. The Court of Appeals also relied on the district court's finding that the defendant exercised an "inordinate amount of discretion" over licensing and renewal of licenses. *Id*.

In rejecting the defendant's second argument, the Seventh Circuit stated: "Hill may not have held a supervisory position, but he had authority to oversee the licensing process and enforce the liquor code…In accordance with the statutory authority delegated by the mayor, Hill could issue subpoenas, conduct on-site inspections of businesses to determine their compliance with local ordinances, and issue citations for violations." *Id*. at 909.

The Court should be guided by other applications of U.S.S.G. §2C1.1(b)(3) which look directly to how much discretion a defendant held. For example, the Seventh Circuit relied on a defendant's "inordinate amount of discretion" he had as the director of land bank. "Walton was the director of the Land Bank, and in that capacity he had an inordinate amount of discretion over the transfer of Land Bank properties. He started and oversaw the process, drafted the resolutions that were rarely questioned, and generally determined who would acquire the City's properties and whether the sale would be through a cooperative nonprofit like IMAC." *United States v. Walton*, 874 F.3d 990, 1003 (7th Cir. 2017). The same level of discretion cannot be said of Mr. Johnson.

According to the Presentence Investigation Report, the stated basis for the 4-level enhancement is that "**as chairperson**, he had influence over other board members, the ability to manipulate the voting agenda, and access to nonpublic information." The probation department's analysis is dependent on Mr. Johnson's appointment as chair of MMLB. However, Mr. Johnson's designation as chair cannot be the lynchpin of the analysis.

First, Mr. Johnson's role as chairperson is of no consequence. The chairman position held no more power or persuasion than any other board member. The government has offered no proof to the contrary – just blanket assertions. Simply, it was a position in name only. He received applications and voted on them like the other board members. There is no evidence that the "chair" designation gave Mr. Johnson any amount of authority over other board members.

Second, the facts of this case are in stark contrast to those of *Hill*, *Watkins*, and every other case relied upon by the government. Each defendant in the cases cited by the government had substantial authority – inordinate discretion – to act on behalf of a governmental entity. In some cases, these defendant's power extended to issuing court orders. The defendant in *Hill* had the authority as liquor commissioner to grant, suspend, or revoke licenses. He even had the authority to issue subpoenas. The defendant in *Watkins* could "single-handedly stop payment on invoices" if in his sole discretion repair work was not completed. These cases run far afield from Mr. Johnson's MMLB position.

Mr. Johnson had no high-level decision-making authority over the MMLB. He was one of 5 members of the board. Each member had an equal vote on applications before the board's consideration. There is no evidence that the MMLB set the agenda and certainly no evidence that it was set by Mr. Johnson. The notion that Mr. Johnson somehow had authority to manipulate the agenda is unsubstantiated. There is no evidence that Mr. Johnson had influence over any decision regarding the MMLB other than to cast his one vote like every other board member. The cases cited by the government bear no relationship to the facts before the Court. As a result, the 4-level enhancement pursuant to U.S.S.G. §2C1.1(b)(3) should not be scored.

Furthermore, it is doubtful that his acceptance of a bribe had an impact on the issuance of licenses. The guidelines are clear that the gross profits associated with a bribe are not the value of the harm. "The harm caused by a bribe is the value lost to a competing party had the bribe not been paid. *See, e.g., United States v. Ford*, 986 F.2d 1423 (6th Cir. 1993) (table) (rejecting the contention that the benefit should be measured by the difference between what the government paid under the contracts and what it would have paid had it not been for the bribes). That harm is independent of the value of the bribe." *United States v. Landers*, 68 F.3d 882, 885 (5th Cir. 1995). The government has presented no evidence that any of Mr. Johnson's votes were outcome-determinative of the issuance of a license. While there is no doubt Mr. Johnson's actions harmed public trust, there is reason to believe his actions did not harm other applicants.

Lastly, the probation department opines that Mr. Johnson was in a sensitive position because he had access to nonpublic information and because he allegedly had influence over other board members. The argument related to influence over other board members is discussed above and is not supported by the evidence. The Court should reject this argument.

As for the argument that he had access to public information, the probation department relies on statements that are protect by the various proffer agreements. The probation department's attempt to rely on these statements is an inappropriate use of this information and should also be rejected by the Court. See, U.S.S.G. §1B1.8.

**2. Paragraph 198 – Downward Departure.**

The Presentence Report indicates there are no factors to support a departure under the sentencing guidelines. Mr. Johnson disagrees. Pursuant to U.S.S.G. §2B1.1, application note 21(C). This paragraph states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

Here, the estimated guideline range, however it is calculated, substantially overstates the seriousness of the offense. While it is true that Mr. Johnson betrayed the public trust vested in him, a years-long custodial period is not proper. As noted above, Mr. Johnson was not an elected official, he was not a high-level decision-maker, and had no ability to unilaterally make decisions on behalf the MMLB, LARA, or the State of Michigan.

As noted above, there is no evidence that Mr. Johnson's votes in favor of applicants that provided benefits resulted in harm as defined by the guidelines. In other words, the government has not established that Mr. Johnson's votes resulted in harm to another applicant. And it is doubtful that Mr. Johnson's votes were outcome determinative because he was only one of five members of the MMLB.

### 3. Paragraph 199 – Downward Variance.

The Presentence Report indicates there are no factors in support of a downward variance pursuant to the Section 3553(a) factors. Mr. Johnson disagrees. He is a husband, father, friend, community member, and public servant. Mr. Johnson engaged in public service for many years, including as Speaker of the House for the Michigan House of Representatives. Mr. Johnson's respect and commitment to each of these roles is well-documented in letters of support provided to the Court.

There are other factors that support a downward variance. Mr. Johnson is 70 years old. He suffers from high blood pressure and other conditions, some of which require regular medical treatment and monitoring. He does not have a single criminal history point. Given the nature of the offense and lack of criminal history points, Mr. Johnson may otherwise be eligible for a 2-level decrease in light of the Federal Sentencing Commission's recent voting on amendments to the guidelines.[1] Accordingly, there are ample bases to vary downward.

---

[1] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_prelim-retro.pdf

## **CONCLUSION**

WHEREFORE, Defendant Rick Johnson respectfully requests that this Court impose a sentence consistence with the sentencing guidelines, Mr. Johnson's history of community service, his cooperation with the government, and his acceptance of responsibility.

                              Respectfully Submitted,

                              DONDZILA LAW, PLLC

Date:  September 14, 2023          By:    */s/ Nicholas V. Dondzila*
                                                             Nicholas V. Dondzila (P73937)
                                                             Attorneys for Defendant Johnson
                                                             7125 Headley Street
                                                             P.O. Box 728
                                                             Ada, MI 49301
                                                             (616) 970-0931
                                                             nickdondzila@gmail.com