UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.

RICK VERNON JOHNSON,

        Defendant.

_____/

No. 1:23-cr-40

Hon. Jane M. Beckering
United States District Judge

# GOVERNMENT'S RESPONSE TO DEFENDANT RICK JOHNSON'S SENTENCING MEMORANDUM

The government submits this response to Defendant Rick Johnson's sentencing memorandum to address his arguments opposing a four-level enhancement under Sentencing Guideline Section 2C1.1(b)(3). *See* R.91: Johnson Sent. Mem., PageID.852-58.

## I. Michigan Law and Undisputed Evidence Demonstrate that Johnson was a Public Official in a High-Level Decision-Making or Sensitive Position.

Johnson incorrectly asserts that his position as chairperson of the Michigan Medical Marijuana Licensing Board ("MMLB") was no different than any of the other members of the Board. Johnson's argument overlooks critical aspects of the state law that specifically empowered the MMLB chairperson with the responsibility to ensure that the Board operated free of conflicts of interest, bribery, and other attempts to corrupt the licensing process. Those state law provisions further support this Court's finding that Johnson was a public official who occupied a high-level decision-making or sensitive position.

Section 305 of the Medical Marijuana Facilities Licensing Act of 2016 required members of the MMLB to immediately provide written notice to the chairperson with details of events that

might call into question the legitimacy of the Board's decisions or lead to corruption within the licensing process. Specifically, the law provided:

> (3) A member, employee, or agent of the board who becomes aware that the member, employee, or agent of the board or his or her spouse, parent, or child is a member of the board of directors of, financially interested in, or employed by a licensee or an applicant **shall immediately provide detailed written notice thereof to the chairperson**.
>
> . . .
>
> (5) Any member, employee, or agent of the board who is negotiating for, or acquires by any means, any interest in any person who is a licensee or an applicant, or any person affiliated with such a person, **shall immediately provide written notice of the details of the interest to the chairperson.** The member, employee, or agent of the board shall not act on behalf of the board with respect to that person.
>
> . . .
>
> (10) A member, employee, or agent of the board or a parent, spouse, sibling, spouse of a sibling, child, or spouse of a child of a member, employee, or agent of the board shall not accept any gift, gratuity, compensation, travel, lodging, or anything of value, directly or indirectly, from any licensee or any applicant or affiliate or representative of a licensee or applicant, unless the acceptance conforms to a written policy or directive that is issued by the chairperson or the board. Any member, employee, or agent of the board who is offered or receives any gift, gratuity, compensation, travel, lodging, or anything of value, directly or indirectly, from any licensee or any applicant or affiliate or representative of an applicant or licensee **shall immediately provide written notification of the details to the chairperson.**
>
> . . .
>
> (12) A member, employee, or agent of the board shall not engage in any conduct that constitutes a conflict of interest and **shall immediately advise the chairperson in writing of the details** of any incident or circumstances that would present the existence of a conflict of interest with respect to performing board-related work or duties.
>
> (13) A member, employee, or agent of the board who is approached and **offered a bribe** as described in section 118 of the Michigan penal code, 1931 PA 328, MCL 750.118, or this act **shall immediately provide written account of the details of the incident to the chairperson** and to a law enforcement officer of a law enforcement agency having jurisdiction.

> . . .
>
> (16) A licensee or applicant or any affiliate or representative of an applicant or licensee shall not engage in ex parte communications with a member of the board. A member of the board shall not engage in any ex parte communications with a licensee or an applicant or with any affiliate or representative of an applicant or licensee.
>
> (17) Any board member, licensee, or applicant or affiliate or representative of a board member, licensee, or applicant who receives any ex parte communication in violation of subsection (16), or who is aware of an attempted communication in violation of subsection (16), **shall immediately report details of the communication or attempted communication in writing to the chairperson.**

See 2016 Mich. Legis. Serv. P.A. 281 (West), codified at Mich. Comp. Laws § 333.27305 (2016) (emphasis added).

The same law empowered Johnson, as chairperson of the MMLB, to confidentially investigate any ex parte communication with a member of the Board that constituted an attempt to influence that member's official action to determine if state law has been violated:

> (18) Any member of the board who receives an ex parte communication in an attempt to influence that member's official action **shall disclose the source and content of the communication to the chairperson**. **The chairperson may investigate** or initiate an investigation of the matter with the assistance of the attorney general and state police **to determine if the communication violates subsection (16) or subsection (17) or other state law.** The disclosure under this section and the investigation are confidential. Following an investigation, **the chairperson shall advise the governor or the board, or both, of the results of the investigation and may recommend action as the chairperson considers appropriate.** If the chairperson receives such an ex parte communication, he or she shall report the communication to the governor's office for appropriate action.

*Id.* (emphasis added). If, after investigation, the chairperson determines that a law was violated, the chairperson may recommend action and a Board member could be removed under Section 301(7). *Id.* Additionally, violations uncovered by the chairperson's investigation also could result in applicants being denied licenses to operate or the revocation or suspension of licenses. *Id.*

Johnson's assertion that his "role as chairperson is of no consequence" because he held "no more power or persuasion than any other board member" is plainly inaccurate. State law gave him the sole power and responsibility on the Board to receive and investigate evidence of conflicts of interest and bribery, and—with or without the assistance of the state police and attorney general— the authority to investigate evidence of any ex parte communications attempting to influence a board member's official action. He occupied a position that was more sensitive and required him to exercise greater investigative and discretionary powers than the positions held by the other Board members. These facts provide further support for the government's argument that Johnson's role and responsibilities are similar to the sensitive positions described in application note 4(B) (law enforcement officer, election official, and similarly situated individuals).

Here, the person empowered with ensuring that the Board was free of corruption was the person who blatantly and repeatedly violated those anti-corruption provisions and failed to disclose those violations to the other members of the Board or to the Governor. He was put in a position to police himself and the other Board members, and he took advantage of that position to solicit and accept bribes. As the old saying goes, Johnson was "the fox guarding the henhouse."

The responsibility and special powers invested specifically in Johnson by state law supports a finding by this Court that Johnson occupied a high-level decision-making or sensitive position as contemplated by USSG § 2C1.1(b)(3).

**II. Johnson's Legal Authority and Argument is Not Persuasive.**

Johnson cites *United States v. McIntosh*, 1992 U.S. App. Lexis 34839 (6th Cir. Dec. 29, 1992), an unpublished per curiam decision, in support of his argument that USSG § 2C1.1(b)(3) should not apply to him. But a later panel of the Sixth Circuit found that *McIntosh*'s analysis of the issue was "minimal," and that "*McIntosh*'s force or persuasiveness is questionable" because of intervening substantive changes to that Guideline provision and its facts. *United States v. Griffith*, 781 F. App'x 418, 421 (6th Cir. 2019).

The facts of *McIntosh* are distinguishable from those present in Johnson's case. That case involved a defendant named Noe, who was an appointed chief of police in a three-officer department in a small Kentucky town with a population of 1,000. Noe received $5,000 in payoffs during an FBI drug trafficking sting operation. *Id.*, 1992 U.S. App. Lexis 34839 at *3. In a cursory, three-sentence analysis that seemed to focus more on the size of the town that defendant worked in than the level of authority he had, the Court reversed application of an earlier version[1] of the enhancement for being a "high-level decision maker." The Court held, "Noe is not a high-level decisionmaker. He is the appointed chief of police of Beattyville, Kentucky, which has a population of only 1,000 and a police force consisting of three officers. Furthermore, Noe works a shift just like his two fellow officers and all important decisionmaking [sic] is done by the mayor and city council of Beattyville." *Id.* at *23.

As noted in *Griffith*, *McIntosh* involved an earlier version of § 2C1.1, which included a more circumscribed commentary interpreting the words "high-level decision-making or sensitive position." The commentary in *McIntosh* provided only these examples:

> "Official holding a high-level decision-making or sensitive position" includes for example, prosecuting attorneys, judges, agency administrators,

---

[1] *See* USSG § 2C1.1(b)(2)(B) (1991), available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1991/manual-pdf/Chapter_2_A-C.pdf

5

> supervisory law enforcement officers, and other governmental officials with similar levels of responsibility.

USSG § 2C1.1(b)(2)(B), comment. (n.1) (1991). The commentary has since been expanded and now states:

> Definition.—"*High-level decision-making or sensitive position*" means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."

USSG § 2C1.1 comment. (n.4(A)) (2021). Additionally, the list of examples has been expanded to include "a juror, a law enforcement officer, and election official, or any other similarly situated individual." *Id.*, comment. (n.4(B)). The current version of the Guidelines would certainly cover the defendant in *McIntosh* because he was a law enforcement officer.

Just as importantly, the facts in *McIntosh* are readily distinguishable. Here, all licensing decisions affecting the multi-billion-dollar marijuana industry in the State of Michigan (population ~10 million) were made by the MMLB, of which Johnson held 1/3 of the voting power and the sole responsibility to police the Board's operations as Chair. Unlike in *McIntosh*, no other board, commission, or person had any decision-making authority over medical marijuana licenses, nor did anyone have more power or decision-making authority on the Board than Johnson. Thus, the rationale in *McIntosh* for not applying the "high-level decision-making" enhancement is inapplicable to this case. Furthermore, *McIntosh* failed to address whether the "sensitive position" prong of the enhancement could be applied in that case and likewise was silent on the application note then in effect, which provided the example of "supervisory law enforcement officers" as a sensitive position. For all those reasons, *McIntosh* lacks relevance and persuasiveness.

**III. This Court Can Rely on Proffered Statements of Other Witnesses.**

Johnson next asserts that the probation officer is improperly relying on "statements that are protect[ed] by the proffer agreements" to opine that Johnson had access to non-public information. (R.91: Johnson Sent. Mem., PageID.858)

The government agrees that this Court cannot use the self-incriminating statements that *Johnson* made during his proffer interviews against him at sentencing to apply a sentencing enhancement. However, to the extent he contends that the Court cannot use statements made by other witnesses in their proffer interviews to calculate Johnson's guideline range, he is mistaken. The relevant Guideline provides:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, *except to the extent provided in the agreement.*

USSG § 1B1.8 (emphasis added). The written proffer agreement that Johnson entered into with the government in December 2022 provided, in pertinent part:

> The United States reserves the right to use any proffered statements, and any other information derived directly or indirectly from those statements, for the purpose of obtaining leads to other evidence. *This derivative evidence may be used by the United States in any stage of any criminal or civil proceeding involving your Client.*

(Exhibit A, attached) (emphasis added).

Those provisions unequivocally allow the government to use Johnson's proffered self-incriminating statements and other information derived from those statements *to obtain evidence from other witnesses or sources*, and to *use that derivative evidence* against Johnson at sentencing. Thus, this Court may rely on evidence proffered by, for example, bribe payers Dalaly and Pierce, even if information proffered by Johnson allowed the government to find admissible evidence

7

from those witnesses or another source. Johnson also cannot prevent this Court from relying on evidence provided by a third party in a proffer-protected interview simply because Johnson provided the same or similar information to the government in his proffer, and he cites no case law in support of such a proposition.

Moreover, even where a probation officer improperly cites a defendant's proffer protected statement as a basis for a guideline calculation, the Sixth Circuit has held that this Court can use other unprotected evidence to calculate the Guidelines without violating Section 1B1.8. *See United States v. Jackson*, 635 F.3d 205, 208 (6th Cir. 2011) (affirming Guidelines scoring based on FBI agent's testimony, not defendant's proffered statements cited by probation officer).

As demonstrated above and in its sentencing memorandum, the government is not relying on any of Johnson's proffered statements as evidence against him at sentencing. Rather, the government is relying on evidence supplied by Pierce, Dalaly, and another representative of Company A to show by a preponderance of the evidence that Johnson provided inside information about MMLB matters to bribe payers and had substantial influence in the decision-making process. The statements of those witnesses are independent sources of evidence that can be used for Guideline scoring. *Id.*

Specifically, the government relies on the following evidence:

- On December 1, 2017, Mr. Johnson sent messages to Mr. Brown asking how he could remove sender information from an email when forwarding the email to another person. After Mr. Brown explained a process, Mr. Johnson sent a text asking if Mr. Brown got an email and a PDF attachment. After Mr. Brown confirmed receipt of the email and attachment, Mr. Johnson sent a message, writing, "Get to others. This may not be out until Monday. Keep it only inner circle." That same day, Mr. Brown sent text messages to multiple clients referring to an email he sent them and informed the recipients not to disclose the attachment because they were not yet public. One recipient referred to the email and attachment as being the rules while another recipient told Mr. Brown they expected the rules to be released the following Tuesday. Mr. Brown told one of his clients to

8

remember they always get this type of information from Mr. Brown first. (R.83: Johnson PSR, ¶ 27)

- Mr. Pierce confirmed the payments to Janice Johnson were payments for access to Mr. Johnson and non-public information Mr. Johnson possessed as chairperson of the MMLB. (Id., ¶ 77)

- Lobbyist and bribe payer Brian Pierce told the FBI that *Johnson had the ability to influence other members of the MMLB*, even if he ultimately did not have as much influence over the licensing process that everyone believed he would have before he was appointed. (Id., ¶ 78) (emphasis added)

- According to bribe payer John Dalaly, Johnson said that he would expedite Company A's application and include it on the next list of applications to be reviewed. (Id., ¶ 86)

- According to Dalaly, one purpose of the bribe payments he agreed to pay to Johnson was to move Company A's application forward and get them approved by Johnson and the payments were to ensure that Johnson put Company A's application on the top. (Id., ¶ 87)

- Other items discussed included Mr. Johnson providing non-public information on municipalities and their intent to opt-in to allow marijuana businesses within the municipalities. (Id., ¶ 92)

- During the lunch meetings [with Dalaly and another representative of Company A], Mr. Johnson provided Mr. Dalaly with information for [Company A, whose] business strategy included contacting groups that were not going to get through the prequalification process due to financial issues. Mr. Johnson provided Mr. Dalaly with copies of spreadsheets listing those companies and their contact information. The spreadsheets also included handwritten notations suggesting which companies were best, or should be a priority, for [Company A] to pursue. [Company A's representative] said he did not know who made the handwritten notations, but he did not believe it was Mr. Dalaly. (Id., ¶ 124)

- [Company A's representative] was instructed by Mr. Dalaly to use the bathroom during the lunches, which is when he believed Mr. Johnson provided the spreadsheets to Mr. Dalaly. It was [Company A's representative's] contention he was instructed to go to the bathroom to give him plausible deniability about the spreadsheets, which Mr. Dalaly would later provide to [him]. The spreadsheets were inside a Fed-Ex style envelope and the companies included on the list were companies that were denied following a public vote. The list was provided to Mr. Dalaly prior to the MMLB or LARA officially publishing the list of denied applicants.

9

[Company A's representative] said he knew the lists came from Mr. Johnson during the lunch meetings because Mr. Dalaly told him as much. (Id., ¶ 125)

- [Company A's representative] confirmed the spreadsheets received from Mr. Johnson were not the same documents published publicly by LARA to document the results of MMLB voting. The lists provided by Mr. Johnson contained more information, including contact information for the companies and handwritten notations. [Company A's representative and Company A] valued the information contained in the spreadsheets because they gave [it] an advantage when it came to acquiring other companies. Reportedly, [Company A] budgeted $100 million for the acquisition of other companies. [Company A's representative] confirmed [it] pursued the acquisition of some of the companies on the lists provided by Mr. Johnson; however, none of the attempted acquisitions came to fruition. (Id., ¶ 126)

- [Company A's representative] recalled a comment made by Mr. Johnson during one lunch meeting that took place after [Company A] was prequalified and while [it] was in the process of acquiring a business called [redacted]. Specifically, he remembered Mr. Johnson saying, "those motherfuckers would never have gotten approved" if it were not for his efforts. [Company A's representative] advised [redacted] was the first license [Company A] attempted to acquire and the approval or acquisition was being held up by LARA. [Company A's representative] believed Mr. Johnson intervened on [its] behalf to get the acquisition and license approved. (Id., ¶ 127)

That evidence demonstrates that Johnson had access to and provided non-public information concerning the MMLB's operations and decisions to representatives of Company A and had substantial influence over the decision-making process.

## Conclusion

For the foregoing reasons, this Court should apply the four-level enhancement in USSG § 2C1.1(b)(3) and adopt the advisory Guideline range of 57-71 months in federal prison and a $20,000 to $200,000 fine based on a total offense level 25 and criminal history category I.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated: September 21, 2023

/s/ *Christopher M. O'Connor*
CHRISTOPHER M. O'CONNOR
Assistant United States Attorney

/s/ *Clay Stiffler*
CLAY STIFFLER
Assistant United States Attorney

United States Attorney's Office
P.O. Box 208
Grand Rapids MI 49501
(616) 456-2404
christopher.oconnor@usdoj.gov
clay.stiffler@usdoj.gov