# Proposed Release Plan



ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

## UNITED STATES DISTRICT COURT
### FOR THE
### ___ Western DISTRICT OF Michigan ___

UNITED STATES OF AMERICA

**Case No.**  **1:23:CR-40-1** ___
(write the number of your criminal case)

v.

Rick Vernon Johnson
Write your full name here.

### PROPOSED RELEASE PLAN
**In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)**

---

#### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

---

If you provide information in this document that you believe should not be publicly available, you may request permission from the court to file the document under seal. If the request is granted, the document will be placed in the electronic court files but will not be available to the public.

Do you request that this document be filed under seal?

☐ Yes

☒ No

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

## PROPOSED RELEASE PLAN

To the extent the following information is available to you, please include the information requested below. This information will assist the U.S. Probation and Pretrial Services Office to prepare for your release if your motion is granted.

### A. Housing and Employment

Provide the full address where you intend to reside if you are released from prison:

16209 13 Mile Road, LeRoy, MI 49655

---

Provide the name and phone number of the property owner or renter of the address where you will reside if you are released from prison:
Janice Johnson   231-233-8462

---

Provide the names (if under the age of 18, please use their initials only), ages, and relationship to you of any other residents living at the above listed address:

None

---

If you have employment secured, provide the name and address of your employer and describe your job duties:

---

List any additional housing or employment resources available to you:

---

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

**B. Medical needs**

Will you require ongoing medical care if you are released from prison?

☒ Yes

☐ No

Will you have access to health insurance if released?

☒ Yes

☐ No

If yes, provide the name of your insurance company and the last four digits of the policy number. If no, how do you plan to pay for your medical care?

Blue Cross Blue Shield Group #4430 Subscriber #4136

_____

If no, are you willing to apply for government medical services (Medicaid/Medicare)?

☒ Yes

☐ No

Do you have copies of your medical records documenting the condition(s) for which you are seeking release?

☒ Yes

☐ No

If yes, please include them with your motion. If no, where are the records located?

_____

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

Are you currently prescribed medication in the facility where you are incarcerated?

☒ Yes

☐ No

If yes, list all prescribed medication, dosage, and frequency:

| | |
|---|---|
| Aspirin: 81 mg Daily | Losartan: 100 mg Daily |
| Carvedilol: 6.25 mg Daily | Magnesium oxide: 250 mg Daily |
| Clopidogrel: 75 mg Daily | Rosuvastatin: 40 mg Daily |
| Furosemide: 40 mg Daily | |

Do you require durable medical equipment (e.g., wheelchair, walker, oxygen, prosthetic limbs, hospital bed)?

☒ Yes

☐ No

If yes, list equipment:

Walker

Do you require assistance with self-care such as bathing, walking, toileting?

☐ Yes

☒ No

If yes, please list the required assistance and how it will be provided:

Do you require assisted living?

☐ Yes

☒ No

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

If yes, please provide address of the anticipated home or facility and the source of funding to pay for it.

---

Are the people you are proposing to reside with aware of your medical needs?

☒ Yes

☐ No

Do you have other community support that can assist with your medical needs?

☒ Yes

☐ No

Provide their names, ages, and relationship to you. If the person is under the age of 18, please use their initials only:

Janice Johnson  Age 56 Spouse
Theresa Davenport  Age 50 Daughter       Numerous other family members, church
Chris Davenport Age 51 Son-in-law        members, doctors, community members

Will you have transportation to and from your medical appointments?

☒ Yes

☐ No

Describe method of transportation:
Personal vehicles:
Janice Johnson
Theresa Davenport        Jim Wanstead
Chris Davenport          Gale Wanstead

## ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

### SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

July 17th 2024
Date

_Rick V. Johnson_
Signature

Rick Vernon Johnson
Name

55930-510
Bureau of Prisons Register #

Great Lakes, Duluth, 208
Bureau of Prisons Facility

4464 Ralston, Duluth, Minnesota 55811
Institution's Address

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

# UNITED STATES DISTRICT COURT
## FOR THE
## ___Western___ DISTRICT OF _Michigan___

UNITED STATES OF AMERICA

v.

**Case No.** __1:23-CR-40-1__
(write the number of your criminal case)

Rick Vernon Johnson
Write your full name here.

## MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION
## In Support of Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)

---

### NOTICE

The public can access electronic court files. Federal Rule of Criminal Procedure 49.1 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

---

If you attach documents to this form that you believe should not be publicly available, you may request permission from the court to file those documents under seal. If the request is granted, the documents will be placed in the electronic court files but will not be available to the public.

Do you request that the attachments to this document be filed under seal?

☐ Yes

☒ No

ATTACHMENT TO MOTION FOR COMPASSIONATE RELEASE

## MEDICAL RECORDS AND ADDITIONAL MEDICAL INFORMATION

To the extent you have medical records or additional medical information that support your motion for compassionate release, please attach those records or that information to this document.

### SIGNATURE

I declare under penalty of perjury that the facts stated in this attachment are true and correct.

7/17/2024
Date

*Rick V. Johnson*
Signature

Rick Vernon Johnson
Name

55930-510
Bureau of Prisons Register #

Great Lakes, Duluth, 208
Bureau of Prisons Facility

4464 Ralston, Duluth, Minnesota  55811
Institution's Address

BETA

 **FORBES** > MONEY > PERSONAL FINANCE

# Bureau Of Prisons Releases Encouraging Study On CARES Act

**Walter Pavlo** Contributor ⓘ

*I write and consult on federal criminal law and criminal justice.*

Follow

🔖   💬 0                                          Mar 30, 2024, 11:27am EDT

C



WASHINGTON - FEBRUARY 28: Federal Bureau of Prisons Director Colette Peters testifies as Justice ...

[+]  CQ-ROLL CALL, INC VIA GETTY IMAGES

Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) on March 25, 2020 just as the pandemic reached the United States. CARES Act allowed individuals in federal correctional facilities who

were a Low or Minimum security risk with underlying health conditions to serve their sentence in home confinement earlier than they would have been eligible for without the CARES Act.

BETA

Prior to the CARES Act, the Federal Bureau of Prisons (BOP) allowed inmates to serve 10% of their sentence imposed, up to a maximum of 6 months, on home confinement as part of completing their sentence. This program too is a success and allows inmates of all security levels to transition back into society. Many of those in federal custody, about 90%, will eventually be released from custody. Transition back to society is an important part of the corrections process.

The BOP has now completed a study on the inmates who were transferred to home confinement under CARES Act and the results are encouraging. In a press release from the BOP, it stated, "These findings suggest that the CARES Act's provision for early and extended home confinement did not negatively impact recidivism rates. In fact, it may have contributed to a reduction in post-release recidivism, offering a promising direction for justice-involved stakeholders seeking effective strategies to reduce incarceration and its associated costs, while also promoting public safety and successful reintegration into society."

Home confinement has been part of an individual's prison term for decades but there are also other credits to reduce prison terms. Most inmates receive Good Conduct Time of 54 days for every year of the imposed sentence (Note: These days can be taken away for disciplinary infractions). In addition, the First Step act allows many Minimum and Low security inmates to earn up to a year off their sentence for participating in programming or productive activities. Now, with information from the CARES Act study, the BOP can have confidence that alternative means of incarceration can be used.

MORE FROM FORBES ADVISOR

**Best High-Yield Savings Accounts Of 2024**

By **Kevin Payne** Contributor

BETA

**Best 5% Interest Savings Accounts of 2024**

By **Cassidy Horton** Contributor

The BOP has the policies to move more Minimum and Low security inmates back into society sooner. Under the Second Chance Act, signed by George W. Bush, inmates can be placed on prerelease custody for up to a year of their sentence. Prerelease custody includes halfway house and home confinement. However, the BOP has struggled recently with halfway house capacity, leaving many of inmates in institutional prisons far longer than necessary. This problem of shortages of halfway house space is problematic because the First Step Act allows inmates to earn credits toward additional home confinement based on the time served. The maximum amount of time an inmate can earn each month is 15 days per month but there is no limit to the amount of credits that can be earned over the term of incarceration. This means that inmates in the future could be on home confinement for years.

**Investing Digest: Know what's moving the financial markets and what smart money is buying with Forbes Investing Digest.**

Email address                                                      Sign Up

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

BOP Director Colette S. Peters commented on the findings, "This study reinforces my belief, shaped by decades of experience in corrections, that alternatives to mass incarceration are the most effective approach. The findings that individuals with a CARES assignment recidivated no more or less than comparable people in home confinement, and even less often post-

release, are encouraging. This study suggests that reducing incarceration for appropriate people through measures like early and extended home confinement does not compromise public safety and in fact, suggests it may contribute to successful reintegration into society."

BETA

The study found that overall, the use of the CARES Act to send individuals to home confinement sooner and for longer periods did not have an apparent negative impact on their recidivism rates compared to others in home confinement. Results indicate that while in home confinement individuals with a CARES assignment fail no more or less than comparable persons in home confinement. And those with a CARES assignment fail less often than comparable persons after release.

This study matters because there are currently 78,000 out of roughly 156,000 inmates who are minimum and low security inmates in federal prison. Supervision of inmates in home confinement is significantly less costly for the BOP than housing inmates in secure custody. According to a Federal Register report on the CARES Act, in Fiscal Year (FY) 2019, the cost of incarceration fee (COIF) for a Federal inmate in a Federal facility was $107.85 per day; in FY 2020, it was $120.59 per day.55 In contrast, according to the Bureau, an inmate in home confinement costs an average of $55 per day—less than half of the cost of an inmate in secure custody in FY 2020. Although the BOP's decision to place an inmate in home confinement is based on many factors, where the BOP deems home confinement appropriate, that decision has the added benefit of reducing the expenditures. Such cost savings were among the intended benefits of the First Step Act.

The BOP intends to build on the information from this study and others on home confinement. Prisons remain crowded and many inmates are serving longer sentences in expensive institutions than are necessary. Home confinement, which is a major benefit to both inmates and tax payers, is a big part of the First Step Act. Whether the BOP can fully implement the

program to get inmates out of prisons and into the community faster
remains a challenge.

BETA

The BOP has not had many good stories over the past 6 years but its use of
home confinement under the CARES Act should embolden the agency to do
even more with the policies that it has in place today.

*Follow me on Twitter or LinkedIn. Check out my website or some of my
other work here.*

 **Walter Pavlo**

<span>Follow</span>

I founded Prisonology, an expert network firm of retired Bureau of Prisons
professionals, to work with defendants and criminal defense lawyers on... **Read More**

Editorial Standards      Reprints & Permissions

ADVERTISEMENT

One Community. Many Voices. Create a free
account to share your thoughts. Read our
community guidelines here.

🔔 Log in

Be the first to comment...

💬

**No one seems to have
shared their thoughts on
this topic yet**

Leave a comment so your
voice will be heard first.

Powered by ⚙ OpenWeb     Terms | Privacy | Feedback

BETA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALPHONSO WOODLEY,                          )
                                           )
                    Petitioner,            )
                                           )
        v.                                 )          Case No. 24- 3053-JWL
                                           )
Warden, USP Leavenworth,                   )
                                           )
                    Respondent.            )
                                           )
_____ )

## MEMORANDUM AND ORDER

Petitioner has filed a *pro se* petition for habeas corpus under 28 U.S.C. § 2241, in which he claims that he is entitled to immediate transfer to prerelease custody.  The Court ordered briefing on an expedited basis, respondent has filed an answer, and petitioner has filed a reply brief, and the matter is thus ripe for ruling.  For the reasons set forth below, the Court **grants** the petition, and respondent is ordered to effect petitioner's transfer to prerelease custody within 30 days of the date hereof.[1]

Habeas corpus review is available under Section 2241 if a prisoner is in custody in violation of the Constitution or federal law.  *See* 28 U.S.C. § 2241(c)(3).  In this case,

---

[1]  In addition, the Court in its discretion **grants** petitioner's motion to file a handwritten petition (Doc. # 2), for the reasons argued by petitioner (the proper form was not available and he was seeking an expedited ruling); because his handwritten petition included the same information required by the form; and because respondent did not oppose the motion.  With his traverse, petitioner sought leave to file that brief out of time, but that motion is **denied as moot**, as the Court previously granted petitioner an extension of time until May 17, 2024, to file the traverse.

petitioner claims that respondent and the Bureau of Prisons (BOP) have violated the governing federal statutes by failing to effect his immediate transfer to prerelease custody.

Respondent first argues that petitioner has failed to exhaust his administrative remedies as required. Petitioner concedes that he has not completed the BOP's usual four-step administrative process. He argues nonetheless that exhaustion should not be required in his case because of futility, based on the following facts: the regional BOP authority has taken over his prison, which has therefore been on lockdown, and the necessary forms are not available; he followed the instructions of BOP personnel in attempting to submit a "sensitive" claim by BP-10 form directly to the regional office, to bypass two administrative steps; and it would take 120 days or more to use the four-step procedure to address his claim that he is entitled to immediate transfer.

Petitioner is correct that "[a] narrow exception to the exhaustion requirement applies if a petitioner can demonstrate that exhaustion is futile." *See Garza v. Davis*, 596 F.3d 1198, 1203 (10th Cir. 2010). As a general rule, the futility exception is not satisfied merely because exhaustion could not be completed by the release date that would apply if a petitioner received the claimed credits, *see Randolph v. Hudson*, 2022 WL 1909051, at *1- 3 (D. Kan. June 3, 2022) (Lungstrum, J.), or because the petitioner may lose time in a residential reentry center, *see Garner v. United States*, 2021 WL 3856618, at *3 (D. Kan. Aug. 30, 2021) (Lungstrum, J.). In this case, however, respondent has not disputed the facts asserted by petitioner, particularly the fact that the necessary forms for exhausting are

2

not available.[2]  In addition, the regional office has already rejected petitioner's claim, even

though, as discussed below, the applicable statutes require petitioner's immediate transfer

to prerelease custody.  Accordingly, the Court finds that exhaustion would be futile in this

case, and it will not dismiss the petition on that basis.

Respondent has conceded the following facts.  Petitioner was sentenced to a term of

imprisonment of 120 months, with 60 months of supervised release, after his conviction

for a drug conspiracy offense.  Based on projected good conduct time, petitioner would

have a statutory release date of April 8, 2027; but because of the application of Earned

Time Credits (ETCs) under the First Step Act (FSA) and because of petitioner's completion

in December 2023 of a Residential Drug Abuse Treatment Program (RDAP), his projected

release date is now April 8, 2025.  The BOP has applied 365 days of ETCs toward

petitioner's release date, and 445 days of ETCs toward time in a residential reentry center

(RRC).  Petitioner is eligible at present for placement in an RRC, and the BOP has notified

petitioner that he will be placed in an RRC in Tampa (his release location) on September

4, 2024.  According to respondent and the BOP, a placement to an RRC is made to the

extent that resources and bed space permit, and that such placement is not required if there

is no space available.

In response to the petition, respondent argues that the place of petitioner's

confinement falls within the BOP's discretion, with which this Court has no authority to

interfere.  Respondent argues that two statutes apply here.  First, 18 U.S.C. § 3624(b) grants

---

[2] Petition asserted these facts in his motion to file a handwritten petition, which was filed before respondent's answer.

3

the BOP the authority to designate the place of a prisoner's confinement and to transfer a prisoner to a different facility. *See id.* That statute also provides that "a designation of a place of imprisonment under this subsection is not reviewable by any court." *See id.* Second, the transfer of a prisoner to prerelease custody is addressed in 18 U.S.C. § 3624. Subsection 3624(c) includes the following relevant provisions:

> **(1) In general. –** The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility [such as an RRC].
>
> **(2) Home confinement authority. –** The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.
>
> . . .
>
> **(4) No limitations. –** Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621. . . .

*See id.* § 3624(c). In addition, Section 3624(g) discusses options for certain eligible prisoners who have earned ETCs under the FSA. *See id.* § 3624(g). Such prisoners "shall be placed in prerelease custody" according to certain conditions, with the options including home confinement and placement in an RRC. *See id.* § 3624(g)(1), (2). That subsection also provides that the BOP "may transfer [such eligible] prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of [ETCs] under section 3632." *See id.* § 3624(g)(3).

4

Respondent is correct that those statutes, by themselves, do not require the BOP to transfer a prisoner to prerelease custody (for instance, at an RRC) as soon as that prisoner is eligible for such placement, for the maximum allowable period of prerelease custody. Rather, Section 3624 provides that the BOP must, to the extent practicable, ensure that a prisoner spends "a portion" of his final 12 months under conditions that will prepare the prisoner for reentry into the community.

Respondent has not addressed the provisions of the FSA set forth in 18 U.S.C. § 3632, however, and the fact that petitioner has earned ETCs. Section 3632(d) provides that prisoners shall earn ETCs based on participation in evidence-based recidivism reduction (EBRR) programming. *See id.* § 3632(d)(4). After describing how such ETCs may be earned, the FSA provides as follows:

> **(C) Application of time credits toward prerelease custody or supervised release. –** Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

*See id.* § 3632(d)(4)(C). Under a plain reading of this provision of the FSA, which includes the word "shall", the BOP is *required* to transfer a prisoner to prerelease custody or supervised release if the prisoner is "eligible" as determined under Subsection 3624(g). Under Section 3624(g), a prisoner is "eligible" if the prisoner has earned ETCs in an amount equal to the remainder of the prisoner's term of imprisonment, which remainder amount has been computed, and the prisoner has met certain benchmarks for the assessed risk of recidivism. *See id.* § 3624(g)(1). Respondent has conceded that petitioner is eligible

for placement in prerelease custody.  Accordingly, the FSA requires the BOP to place petitioner in prerelease custody.

Respondent's excuse for delaying petitioner's transfer to an RRC is that bed space is not available in a particular RRC until September.  No such condition concerning bed availability is included among the requirements for eligibility under Section 3624(g), however, and thus immediate placement in prerelease custody is nevertheless required under Section 3632(d)(4)(C).[3]  As noted above, that statute uses the mandatory "shall" (as distinguished, for instance, from the provision in Section 3624(g)(3) that the BOP "may" transfer a prisoner to early supervised release).  Numerous courts have held that the BOP has no discretion to delay or refuse transfer of an eligible prisoner to prerelease custody, which transfer is mandatory. *See, e.g.*, *Doe v. Federal Bur. of Prisons*, 2024 WL 455309, at *1-4 (S.D.N.Y. Feb. 5, 2024) (transfer to prerelease custody was required despite the prisoner's participation in the witness protection program); *Ramirez v. Phillips*, 2023 WL 8878993, at *4 (E.D. Cal. Dec. 22, 2023) (agreeing with interpretation that transfer to prerelease custody is mandatory, BOP has no discretion not to transfer); *Komando v. Luna*, 2023 WL 310580, at *4-8 (D.N.H. Jan. 13, 2023) (transfer to prerelease custody was required despite outstanding detainer; rejecting argument that the BOP had discretion to determine which prisoners were suitable for placement in prerelease custody), *report and*

---

[3]  The applicable provisions requiring transfer to prerelease custody of eligible prisoners who have earned ETCs are thus distinguished from the provisions of Section 3624(c), which include the qualifying language "to the extent practicable."  No such qualifying language is found in the mandate of Section 3632(d)(4)(C) or the eligibility requirements of Section 3624(g)(1).

*recommendation adopted*, 2023 WL 1782034 (Feb. 6, 2023); *Sierra v. Jacquez*, 2022 WL 18046701, at *4 (W.D. Wash. Dec. 27, 2022) (transfer to prerelease custody required despite immigration detainer, rejecting argument for discretion), *report and recommendation adopted*, 2023 WL 184225 (Jan. 13, 2023); *Jones v. Engelman*, 2022 WL 6563744, at *9-13 (C.D. Cal. Sept. 7, 2022) (transfer to prerelease custody was mandatory despite pending charges and argument that the prisoner was a flight risk), *report and recommendation adopted in relevant part*, 2022 WL 6445565 (Oct. 7, 2022).[4]

Respondent has not addressed this authority or cited any contrary authority, and the Court is not aware of any court that has interpreted the mandatory language of Section 3632(d)(4)(C) in any other way. Respondent relies on a prior decision in which this Court stated that a prisoner has no constitutional right to be placed in a particular facility and that the BOP has exclusive authority and discretion to designate the place of confinement. *See Lee v. English*, 2019 WL 3891147, at *9-10 (D. Kan. Aug. 19, 2019) (Lungstrum, J.), *aff'd sub nom. Jones v. English*, 817 F. App'x 580 (10th Cir. 2020). There is no indication that the prisoner in that case was an eligible prisoner who had earned ETCs, however, and neither this Court nor the Tenth Circuit addressed the applicability of Section 3632(d)(4)(C) in that case. *See id.*; *Jones*, 817 F. App'x 580. In this case, it is clear that the BOP has no discretion to refuse or delay the transfer of petitioner to prerelease custody.[5]

---

[4] Because the statute is clear that transfer to prerelease custody is mandatory, any contrary interpretation by the BOP (had it offered one) would not be entitled to any deference. *See Komando*, 2023 WL 310580, at *7-8; *Jones*, 2022 WL 6563744, at *9.

[5] In *Jones*, the Tenth Circuit noted that although a transfer to an RRC affects the conditions of confinement, not its duration, it had allowed prisoners to challenge by habeas Continued…

Finally, the Court notes that respondent has argued that petitioner's transfer to a particular RRC was scheduled for the future based on bed availability.  Respondent has not argued or provided evidence, however, that there is no available space for petitioner in any RRC, or that his immediate transfer to prerelease custody cannot be accomplished.  In this regard, the Court notes that while the FSA requires transfer to prerelease custody, the BOP retains the discretion to decide whether to transfer petitioner to an RRC or to home confinement, or even whether to transfer petitioner to early supervised release.  *See Ramirez*, 2023 WL 8878993, at *4; *Komando*, 2023 WL 310580, at *6.  Nor does the Court require that petitioner be placed in any particular RRC; thus, the BOP retains the discretion to choose the particular prerelease facility.  The Court notes, however, that Section 3624(g) requires the BOP to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners."  *See* 18 U.S.C. § 3624(g)(11); *Doe*, 2024 WL 455309, at *4.

Accordingly, because the BOP's failure to transfer petitioner to prerelease custody violates federal law, the Court grants the petition for relief.  Respondent and the BOP are ordered to effect such a transfer.


IT IS THEREFFORE ORDERED BY THE COURT THAT the petition for habeas corpus under 28 U.S.C. § 2241 is hereby **granted,** and respondent is ordered to effect petitioner's transfer to prerelease custody within 30 days of the date hereof.

---

petition under Section 2241 whether the BOP had followed the law in evaluating whether to approve such a transfer.  Here, the Court has determined that the BOP did not follow the law with respect to its transfer decision involving petitioner; thus, the Court has determined that habeas relief is appropriate.

IT IS SO ORDERED.

Dated this 15th day of May, 2024, in Kansas City, Kansas.

/s/  John W. Lungstrum
Hon. John W. Lungstrum
United States District Judge

9



**U.S. Department of Justice**
Federal Bureau of Prisons

O P E R A T I O N S   M E M O R A N D U M

| | |
|---|---|
| OPI: | RSD/RRM |
| NUMBER: | 001-2019 |
| DATE: | April 4, 2019 |
| EXPIRATION DATE: | April 4, 2020 |

# Home Confinement under the First Step Act

/s/

*Approved:* Hugh J. Hurwitz
Acting Director, Federal Bureau of Prisons

The First Step Act of 2018 (FSA) contained additional requirements for the Bureau of Prisons (Bureau) in placing inmates in home confinement generally, and re-established and expanded a pilot program under the Second Chance Act to place elderly and terminally ill inmates in home confinement.

The terms "home confinement" and "home detention" are used interchangeably in this Operations Memorandum.

Institution Supplement.  None required.  Should local facilities make any changes outside the required changes in the national policy or establish any additional local procedures to implement the national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 1.  HOME CONFINEMENT FOR LOW RISK OFFENDERS

Section 602 of the FSA modified 18 U.S.C. § 3621 (c)(1), authorizes the Bureau to maximize the amount of time spent on home confinement when possible.  The provision now states, with the new FSA language in **bold**,

"Home confinement authority. – The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.  **The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.**"

The Bureau interprets the language to refer to inmates that have lower risks of reoffending in the community, and reentry needs that can be addressed without RRC placement.  The Bureau currently utilizes home confinement for these inmates.  Accordingly, staff should refer eligible inmates for the maximum amount of time permitted under the statutory requirements.

The statutory language will be added to the Program Statement **Home Confinement**.

## 2.  PILOT PROGRAM FOR ELIGIBLE ELDERLY OFFENDERS AND TERMINALLY ILL OFFENDERS

Section 603 (a) of the FSA reauthorized and modified the pilot program conducted under the Second Chance Act, 34 U.S.C. § 60541, as follows:

### (a) **Scope of Pilot**

The Bureau shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

Under 34 U.S.C. § 60541 (h), the pilot will be conducted during Fiscal Years 2019 through 2023.

### (b) **Placement in home detention**

The Bureau may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau facilities to home detention, upon written request from either the Bureau staff, or an eligible elderly offender or eligible terminally ill offender.

### (c) **Waiver**

Under 34 U.S.C. § 60541 (g)(1)(C), the Bureau is authorized to waive the requirements of section 3624 of Title 18 [home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months] as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau facilities to home detention for the purposes of the pilot program.

### (d) **Violation of terms of home detention**

A violation by an eligible elderly offender or eligible terminally ill offender of the terms of home detention (including the commission of another Federal, State, or local crime) shall result in the removal of that offender from home detention and the return of that offender to the designated Bureau institution in which that offender was imprisoned immediately before placement on home detention as part of this pilot, or to another appropriate Bureau institution, as determined by the Bureau.

The Bureau will remove an inmate from this pilot in accordance with the Program Statement **Inmate Discipline Program**, and the Program Statement **Home Confinement**.

**(e) Definitions**

The following statutory definitions set out criteria for the implementation of this pilot program only:

**Eligible elderly offender** means an offender in the custody of the Bureau-

(1) who is not less than 60 years of age;

(2) who is serving a term of imprisonment that is not life imprisonment based on conviction  for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18), sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2⁄3 of the term of imprisonment to which the offender was sentenced;

(3) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in paragraph (2), above.

(4) who has not been determined by the Bureau, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of  violence, or of engaging in conduct constituting a sex offense or other offense described in paragraph 2 above;

(5) who has not escaped, or attempted to escape, from a Bureau of Prisons institution (to include all security levels of Bureau facilities);

(6) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and

(7) who has been determined by the Bureau to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

**Eligible terminally ill offender** means an offender in the custody of the Bureau who—

(1) is serving a term of imprisonment based on conviction for an offense or offenses that do  not include any crime of violence (as defined in section 16(a) of Title 18, United States Code), sex offense (as defined in section 111(5) of the Sex Offender Registration and  Notification Act (34 U.S.C. § 20911(5))), offense described in section 2332b(g)(5)(B) of Title 18, United States Code, or offense under chapter 37

of Title 18, United States Code;

(2) satisfies the criteria specified in paragraphs 3 through 7 included in the Eligible
Elderly Offender definition, above; and

(3) has been determined by a medical doctor approved by the Bureau, i.e. Clinical
Director of the local institution, to be:

- in need of care at a nursing home, intermediate care facility, or assisted living
facility, as those terms are defined in section 232 of the National Housing Act
(12 U.S.C. § 1715w); or

- diagnosed with a terminal illness.

**Home detention** has the same meaning given the term in the Federal Sentencing Guidelines
as of April 9, 2008, and includes detention in a nursing home or other residential long-term
care facility.   As with all home confinement placements, the home must be found to be
appropriate under the provisions of the Program Statement **Home Confinement**.

**Term of imprisonment** includes multiple terms of imprisonment ordered to run
consecutively or concurrently, which shall be treated as a single, aggregate term of
imprisonment for purposes of this section.

**(f) Procedures**

Offenders referred under this pilot shall be processed for home detention utilizing current
RRC/Home Confinement procedures.

**For Eligible Elderly Offenders**, a BP-A0210, Institutional Referral for CCC Placement,
will be completed.   Staff should refer all inmates meeting criteria (1) through (5) in the
definition of Eligible Elderly Offender, above.   Reentry Services Division (RSD) staff will
determine if the inmate meets criteria (6) and (7) under the definition.   A clear annotation
will be made on the referral packet that "**This inmate is being referred for Home
Confinement placement under the provisions contained in the First Step Act for
placement of eligible elderly offenders and eligible terminally ill offenders**."

**For Eligible Terminally Ill Offenders**, to include debilitated offenders that may need
placement in nursing home, intermediate care facility, or assisted living facility, institution
staff  will refer the inmate for a Reduction in Sentence (RIS) under Program Statement
**Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18
U.S.C. §§ 3582 and 4205(g)**.   If not appropriate for a RIS, the Office of General Counsel
will provide RSD the RIS packet for consideration under this pilot.

**(g)  Reporting and Tracking**

34 U.S.C. § 60541 (g) (4), as amended by the FSA, requires an evaluation of the pilot program, and a report to Congress after its conclusion in 2023.   The following data points, at a minimum,  will be tracked by RSD to assist with this evaluation and report:

- The number of Eligible Elderly Inmates referred to RSD;
- The number of Eligible Terminally Ill Inmates referred to RSD;
- The number of placements in home detention for each category;
- The length of time of home confinement afforded under each category;
- The estimated amount net reduction of costs to the Federal Government for each case; and
- The estimated amount net reduction of costs to the Federal Government for the pilot period.

**ADDENDUM – REFERENCED AUTHORITIES**

**18 U.S.C. § 16  -  Crime of violence defined**

The term "crime of violence" means–

(a)   an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b)   any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*NOTE:  34 U.S.C. § 60541, as amended by the FSA, provides that section 16 (a) and (b) be applied when determining eligibility of an elderly offender;  but only section 16 (a) should be applied when determining the eligibility of a terminally ill offender under this pilot.*

Please contact the Office of General Counsel for any questions of whether an offense is a crime of violence under 18 U.S.C. § 16.

**34 U.S.C. § 20911 (5) -  Relevant definitions, including Amie Zyla expansion of sex offender definition and expanded inclusion of child predators**

(A) Generally

Except as limited by subparagraph (B) or (C), the term "sex offense" means–

(i)   a criminal offense that has an element involving a sexual act or sexual contact with  another;

(ii) a criminal offense that is a specified offense against a minor;

(iii) a Federal offense (including an offense prosecuted under section 1152 or 1153 of Title 18) under section 1591, or chapter 109A, 110 (other than section 2257, 2257A, or 2258), or  117, of Title 18;

(iv) a military offense specified by the Secretary of Defense under section 115(a)(8)(C)(i)  of Public Law 105-119 (10 U.S.C. 951 note); or

(v) an attempt or conspiracy to commit an offense described in clauses (i) through (iv).

(B)  Foreign convictions

A foreign conviction is not a sex offense for the purposes of this subchapter if it was not

obtained with sufficient safeguards for fundamental fairness and due process for the accused under guidelines or regulations established under section 20912 of this title.

(C) Offenses involving consensual sexual conduct

An offense involving consensual sexual conduct is not a sex offense for the purposes of this subchapter if the victim was an adult, unless the adult was under the custodial authority of the offender at the time of the offense, or if the victim was at least 13 years old and the offender was not more than 4 years older than the victim.

## 18 U.S.C. § 2332b(g)(5)(B) - Acts of terrorism transcending national boundaries

A violation of the following sections of Title 18, United States Code:

32 (relating to destruction of aircraft or aircraft facilities),
37 (relating to violence at international airports),
81 (relating to arson within special maritime and territorial jurisdiction),
175 or 175b (relating to biological weapons),
175c (relating to variola virus),
229 (relating to chemical weapons),
351, Subsections (a), (b), (c), or (d) (relating to congressional, cabinet, and Supreme Court assassination and kidnaping),
831 (relating to nuclear materials),
832 (relating to participation in nuclear and weapons of mass destruction threats to the United States),
842(m) or (n) (relating to plastic explosives),
844(f)(2) or (3) (relating to arson and bombing of Government property risking or causing death),
844(i) (relating to arson and bombing of property used in interstate commerce),
930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon),
956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad),
1030(a)(1) (relating to protection of computers),
1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers),
1114 (relating to killing or attempted killing of officers and employees of the United States),
1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons),
1203 (relating to hostage taking),
1361 (relating to government property or contracts),
1362 (relating to destruction of communication lines, stations, or systems),
1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States),
1366(a) (relating to destruction of an energy facility),
1751(a), (b), (c), or (d) (relating to Presidential and Presidential staff assassination and kidnaping),

1992 (relating to terrorist attacks and other acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air),

2155 (relating to destruction of national defense materials, premises, or utilities),

2156 (relating to national defense material, premises, or utilities),

2280 (relating to violence against maritime navigation),

2280a (relating to maritime safety),

2281 through 2281a (relating to violence against maritime fixed platforms),

2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States),

2332a (relating to use of weapons of mass destruction),

2332b (relating to acts of terrorism transcending national boundaries),

2332f (relating to bombing of public places and facilities),

2332g (relating to missile systems designed to destroy aircraft),

2332h (relating to radiological dispersal devices),

2332i (relating to acts of nuclear terrorism),

2339 (relating to harboring terrorists),

2339A (relating to providing material support to terrorists),

2339B (relating to providing material support to terrorist organizations),

2339C (relating to financing of terrorism),

2339D (relating to military-type training from a foreign terrorist organization), or

2340A (relating to torture).

A violation of the following sections of Title 42, United States Code:

2122 (relating to prohibitions governing atomic weapons), or

2284 (relating to sabotage of nuclear facilities or fuel).

A violation of the following sections of Title 49, United States Code:

46502 (relating to aircraft piracy),

46504 - the second sentence of the section (relating to assault on a flight crew with a dangerous weapon),

46505(b)(3) or (c) (relating to explosive or incendiary devices, or endangerment of human life by means of weapons, on aircraft),

46506 if homicide or attempted homicide is involved (relating to application of certain criminal laws to acts on aircraft), or

60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility).

A violation of the following section of Title 21:

960, which is section 1010A of the Controlled Substances Import and Export Act (relating to narco-terrorism).

## 18 U.S.C. Chapter 37 - Espionage and Censorship

792, Harboring or Concealing Persons

793, Gathering, Transmitting or Losing Defense Information

794, Gathering or Delivering Defense Information to Aid Foreign Government

795, Photographing and Sketching Defense Installations

796, Use of Aircraft for Photographing Defense Installations

797, Publication and Sale of Photographs of Defense Installations

798, Disclosure of Classified Information

798a, Temporary Extension of Section 794

799, Violation of Regulations of National Aeronautics and Space Administration

## 12 U.S.C. § 1715w - Mortgage insurance for nursing homes, intermediate care facilities, and board and care homes

(a) Definitions - For the purposes of this section–

(1) the term "**nursing home**" means a public facility, proprietary facility or facility of a private nonprofit corporation or association, licensed or regulated by the State (or, if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located), for the accommodation of convalescents or other persons who are not acutely ill and not in need of hospital care but who require skilled nursing care and related medical services, in which such nursing care and medical services are prescribed by, or are performed under the general direction of, persons licensed to provide such care or services in accordance with the laws of the State where the facility is located;

(2) the term "**intermediate care facility**" means a proprietary facility or facility of a private nonprofit corporation or association licensed or regulated by the State (or, if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located) for the accommodation of persons who, because of incapacitating infirmities, require minimum but continuous care but are not in need of continuous medical or nursing services;

(3) the term a "**nursing home**" or "**intermediate care facility**" may include such additional facilities as may be authorized by the Secretary for the nonresident care of elderly individuals and others who are able to live independently but who require care during the day; . . .

(4) the term "**assisted living facility**" means a public facility, proprietary facility, or facility of a private nonprofit corporation that--

a. is licensed and regulated by the State (or if there is no State law providing for such licensing and regulation by the State, by the municipality or other political subdivision in which the facility is located);

b. makes available to residents supportive services to assist the residents in carrying out activities of daily living, such as bathing, dressing, eating, getting

in and out of bed or chairs, walking, going outdoors, using the toilet, laundry, home management, preparing meals, shopping for personal items, obtaining and taking medication, managing money, using the telephone, or performing light or heavy housework, and which may make available to residents home health care services, such as nursing and therapy; and

c. provides separate dwelling units for residents, each of which may contain a full kitchen and bathroom, and which includes common rooms and other facilities appropriate for the provision of supportive services to the residents of the facility;